·APOLLOS R. WETMORE, HOWELL HOPPOCK, R. L. STUART and A. STEWART *vs.* STORY, RADFORD and MURPHY.

·When the charter of the city of New York, granted in 1830, declared that the legislative power of the corporation should be " vested in a Board of Aldermen and a Board of Assistants," who, together, should form the common council of the city, it must be considered as having adopted, by implication, so far as applicable, the universally recognized principles of *le islative* bodies, consisting of two independent branches.

Hence a resolution, adopted by the board of assistants, in one year, cannot be concurred in by the board of aldermen in another year, so as to make it, without consulting the existing board of assistants, an ordinance of the common council. It must, as in the case of unfinished business in other legislative bodies, be taken up *de novo.*

Accordingly *held* that the board of aldermen of the year 1853, could not take up, and pass, a resolution of the board of assistants of the year 1852, authorizing the construction of a rail road in the streets of the city, and give it effect as a law, without consulting the newly elected body.

Such a resolution, although passed by *a* board of aldermen and by a board of assistants, is not a resolution of the *common council,* and, as a consequence, was not confirmed by the act of the legislature, passed April 4, 1854, relative to the construction of rail roads in cities.

That act, in excepting from its operation rail roads already " constructed in part," meant those constructed under lawful authority, and not such as were made under grants, licenses, resolutions or contracts which had never been made, given, passed or entered into according to the charter, and which, therefore, having in judgment of law no existence, could not be confirmed.

A rail road constructed in the streets of the city of New York under and by virtue of a resolution adopted by the board of assistants, in one year, and concurred in by the board of aldermen in another year, having no warrant for its commencement, and none for its continuance, is not only a public nuisance, but a

Wetmore *v.* Story.

public nuisance of which tax payers and owners of property on the streets through which the rails are laid have a legal right to complain, as specially injurious to them in their ingress and egress to and from their places of business.

Such a nuisance may be restrained by injunction, upon the application of the parties specially aggrieved.

But such parties are not entitled to any compensation, nor to an injunction, on the ground that no compensation has been awarded to them for the land in the streets; claimed by them ; inasmuch as, even if they have any title to those lands, their property will not be used for any purpose other than to pursue previously acquired privileges.

An authorized rail road in a city is not, *per se,* a nuisance. When the principal act is sanctioned, that legalizes the temporary obstruction to the public, caused by the prosecution of the appropriate work, and would prevent any effectual action by individuals on account of any consequential injury—although it might be peculiar to them—which should necessarily result from it. But it is otherwise when the rail road is constructed without the requisite authority. *Per* S. B. STRONG, J.

APPEAL by the plaintiffs from a judgment entered at a special term, dissolving an injunction. The complaint was filed by the plaintiffs, owners of property and tax payers, in the city of New York, to restrain the defendants from constructing a rail road (called the Ninth Avenue Rail Road) through Washington and Greenwich streets, under an alleged grant from the common council of the city, which the plaintiffs insisted was invalid. The injunction restrained the defendants "from entering into, or upon, Greenwich and Washington streets for the purpose of laying or establishing a rail road therein, and from digging up, or subverting, the soil, or doing any other act in those streets, tending to incumber them, or to prevent the free and common use thereof, as the same have been heretofore enjoyed." The defendants, in their answer, insisted upon the validity of their grant, and the power of the common council to make it, and denied that the plaintiffs were the owners of the soil of the streets, but on the contrary alleged that the ownership thereof was vested in the corporation of the city. The cause was tried before Justice COWLES, at special term, without a jury. On the trial the defendants introduced and proved the

---
Wetmore *v.* Story.
---

following resolutions of the common council, and relied upon them as their authority for constructing the rail road in question.

"*Resolved,* That the common council do hereby grant the right and privilege to James Murphy, William Radford and Miner C. Story, and their respective assigns, and to those they may associate with them, to construct a rail road from Fifty-first street to the Battery, and back, in and through the following streets, viz :

With a double track from Fifty-first street through the Ninth avenue to Gansevoort street, thence by a single track through Greenwich street to the Battery, and by a single track through Gansevoort street to Washington street, and through Washington street to the Battery, and through Battery place between Greenwich and Washington streets, to connect the said single tracks.

And also to run cars for the conveyance of passengers, &c. upon said road, each and every day, at such times as they may think proper, subject to provisions hereinafter named.

Provided, said rail road shall be constructed in all respects after the manner of the construction of the Eighth Avenue Rail Road; and,

Provided, that in no case steam power be used on any part of said rail road; and also,

Provided, that the said grantees shall begin the construction of said road on or before the first day of May next, and shall complete the same, and commence running cars thereon within eighteen months thereafter; and also,

Provided, that the said grantees shall run cars upon the road so constructed, each way between Fifty-first street and the Battery, every day as often as every fifteen minutes, from 5 to 6 A. M., and every four minutes from 6 A. M. to 8 P. M.; every fifteen minutes from 8 P. M. to 12 M., and as much oftener as public convenience may require, under such directions as the common council may from time to time prescribe; and,

Provided, that not more than five cents be charged for each passenger riding over the whole or any portion of the distance of said road; and also,

Wetmore *v.* Story.

Provided, that said grantees shall keep the space between the tracks, and the space for two feet each side of the same, at all times in thorough repair ; and also,

Provided, that the said cars shall be licensed by the mayor, and the grantees shall pay the annual fee of twenty dollars per car for such license ; and also,

The said grantees, and their associates and assigns, shall have the privilege to organize a joint stock association, either with or without incorporation, to carry out the objects of this grant, and a majority in interest of the grantees, their assigns and associates, shall have the control, management and direction of the road, and the business thereof; and should any or either of the grantees or their associates, or of the shareholders, neglect to pay their respective proportion of the money required for carrying into full effect the grant hereby made, when by such majority thereunto required, the others shall be at liberty to make such payment, and this grant shall enure to the benefit of those who pay in the proportion of their respective contributions.

These resolutions shall be certified by said grantees above named, and a copy thereof, signed by them, shall be deemed the agreement between the mayor, aldermen and commonalty of the city of New York and said associates, and shall be sufficient in all respects to give and grant to the said grantees, their associates and assigns aforesaid, the right and privilege above mentioned, and bind them to conform to the directions herein contained.

And also provided that said rail road shall be continued from Fifty-first street, along the Ninth avenue, to the Bloomingdale road ; thence along the Bloomingdale road to the Tenth avenue ; thence along the Tenth avenue to the Harlem river, whenever required by the common council, and as soon and as fast as said avenues are graded.

Adopted by the board of assistants, December 20, 1852.
    "    "    "    aldermen, January 5, 1853.

Received from his honor the mayor, January 12, 1853, with his objections thereto.

Board of Aldermen, November 14, 1853. Taken up, reconsidered and adopted, notwithstanding the objections of his honor the mayor thereto, two-thirds of the members elected voting in favor thereof.

Board of Assistants, December 28, 1853. On ayes and noes, adopted, notwithstanding the objections of his honor the mayor thereto, two-thirds of all the members elected voting in favor thereof; therefore, under the provisions of the amended charter, the same became adopted.

D. T. VALENTINE, Clerk, C. C."

The following acceptance of the grant, by the defendants, was also proved: "City and county of New York, ss: We, James Murphy, William Radford and Miner C. Story, the grantees in the foregoing resolutions, do hereby certify, as therein required, that the said resolutions, and the conditions and provisions therein specified, contain the agreement between us and the mayor, aldermen and commonalty of the city of New York, in relation to the right, privilege and grant made and conferred upon us and our associates and assigns, by said mayor, aldermen and commonalty, in and by the same.

In witness whereof, we have hereunto subscribed our names, at the city of New York, the thirtieth day of December, one thousand eight hundred and fifty-three.

JAMES MURPHY,<br>WILLIAM RADFORD,<br>MINER C. STORY.

In the presence of John B. Haskin."

The following facts were found by the court. *First.* That the permission to lay down a rail road track was granted to the defendants, under certain resolutions set forth in the complaint and passed by the common council of this city.

*Second.* That such resolutions were accepted by the defendants, who executed the instrument provided therefor in such resolutions.

*Third.* That the defendants commenced the construction of such railway track within the time specified in such resolutions.

*Fourth.* That it was not proved that any offer more favorable

to the tax payers of the city or to passengers in the cars to be run over such track, than the permission granted to the defendants, was made in good faith to such common council.

*Fifth.* That the construction of such rail road along the line of either Washington or Greenwich streets, intermediate the intersection of the northerly line of Reade and the southerly line of Courtlandt streets, with said Washington and Greenwich streets, would inflict serious private injury upon the plaintiffs, in unduly obstructing them in approaches to their respective places of business adjoining upon such streets, amounting in its effects and consequences to a private nuisance to the plaintiffs, unless the grant is valid—but on the other parts of the line would be neither a public nor a private nuisance.

And the judge held, upon these facts, and as matter of law : *First.* That all proper legal formalities had been complied with in the passage of such resolutions requisite to render them valid.

*Second.* That it was a matter of discretion resting with the common council to determine whether or not such permission should be given. That having exercised such discretion, and made the grant in the manner and after the form required by law, it was an exercise of legislative discretion, which this court has not the power to rescind.

*Third.* That such grant was legal and valid, and that the defendants could not be restrained from proceeding with the construction of such road. That the injunction granted should be dissolved, and that the defendants have judgment therefor.

The complaint was therefore dismissed with costs, and the injunction dissolved. The plaintiffs excepted to the decision, in each of the above particulars, and appealed to the general term.

*S. Beardsley* and *John Van Buren,* for the appellants. The plaintiffs file this complaint to obtain relief against the contemplated acts of the defendants, which, as is claimed, threaten serious injury to their rights. Those rights are—1st. As tax payers and corporators, to restrain any unlawful disposition of the corporate property. 2d. As holders and occupants of property

on the line of Greenwich and Washington streets, to restrain any acts in said streets which would interrupt the passage, or interfere with their legal enjoyment of their property. The plaintiffs claim to do the acts which they are about to perform under the authority of an alleged resolution of the common council. If this is a valid authority, it constitutes a defense to the action; and whether it is valid or not, the plaintiffs have an obvious right to inquire. No question can possibly arise in this case as to the necessity of making the attorney general a prosecuting party, this not being an action to restrain a corporation from exercising a franchise, or to forfeit its charter, or in fact a suit against the corporation *at all.* It is an action by certain private individuals against certain other private individuals, to restrain an apprehended violation of private rights. Nor will this court now hear an argument on the question of the right of one tax payer in behalf of himself and such others as choose to become parties to the action, to restrain an illegal disposition of the corporate property, even by the corporation itself. (*Christopher* v. *Mayor of N. Y.* 13 *Barb.* 567. *De Baun* v. *Mayor of N. Y.* 16 *id.* 392. *Roosevelt* v. *Draper, Mss. Op. of supreme court, Mitchell, J. Milhau* v. *Sharp,* 15 *Barb.* 193. *Stuyvesant* v. *Pearsall, Id.* 244.) And when an illegal interference with a public street is threatened, an owner of property upon the street has uniformly been adjudged by this court entitled to restrain such interference. (*Corning* v. *Lowerre,* 6 *John. Ch.* 439. *Oakley* v. *Trustees of Williamsburgh,* 6 *Paige,* 262. *Lawrence* v. *Mayor of N. Y.* 2 *Barb.* 577. *Milhau* v. *Sharp,* 17 *id.* 444. *Eden on Inj., (by Waterman,)* 259, 267, *and notes. Davis* v. *The Mayor &c. of N. Y.* 2 *Duer,* 663. 2 *Story's Eq. Jur.* §§ 925, 926. *People* v. *Sturtevant, court of appeals, Op. by Johnson, J. Spencer* v. *London and Birmingham R. R. Co.* 8 *Sim.* 193. *Sampson* v. *Smith, Id.* 272. *Davis* v. *Mayor &c. of N. Y.* 1 *Duer,* 451.) The evidence shows that the plaintiffs, in the year 1853, paid exceeding $13,000 for taxes on their property in the city; also that they severally own and occupy property upon the line of Greenwich or Washington streets, and have so owned and oc-

Wetmore *v.* Story.

cupied for many years past. Also that the construction of the proposed road would injure the premises of the plaintiffs in a degree and to an extent which this court at special term, standing in place of a jury, found and determined would be "a private nuisance as respects these plaintiffs." Also that responsible individuals offered to construct the proposed road, and pay to the corporation $100 license fee on each car, and charge but 3 cents fare, instead of the license fee of $20 per car, and the 5 cents fare charged and permitted in the alleged grant to the defendants. Other testimony was offered at the trial, by the plaintiffs, showing bad faith in the making of the alleged grant to the defendants, but was objected to, excluded by the court, and exception taken. No testimony was offered on the part of the defendants, showing why the alleged grant was made to them, or why more advantageous offers were rejected, or why no competition was allowed. Notwithstanding, it appeared from the veto of the mayor, that their attention was directed to these prominent objections to the alleged grant. The grant in question was originally passed in the board of aldermen on November 22, 1852, as a grant to Kipp & Brown. It was amended in the board of assistants by substituting the names of the defendants, and in several other important particulars, and passed December 6, 1852. The terms of office of the members of this board of assistant aldermen expired by law on the first Monday of January, 1853. On January 5, 1853, the resolution as thus amended was passed by the board of aldermen. On January 12, 1853, it was returned to the board of aldermen by Mayor Westervelt, with his objections. On November 14, 1853, it was again passed by the board of aldermen, and on December 28, 1853, it was concurred in by the then board of assistant aldermen, notwithstanding said mayor's objections. The offer heretofore referred to was presented to the board of assistant aldermen by the president thereof, November 23, 1853. On November 29, 1853, a petition numerously signed by owners and occupants on Greenwich and Washington streets, was presented to said board of assistant aldermen, requesting a hearing on the subject of this grant. Such hearing was promised, but never

granted.   The great value of the privileges sought to be conferred on the defendants is shown by the fact that the proposed
rail road will be the only one extending to the southerly extremity of the city of New York, and the right of way for its
entire length (exceeding 12 miles) is granted without any compensation whatever, unless the license fee of $20 per car be
called such compensation.   The cause was tried before Justice
Cowles, commencing June 15, 1855, and the testimony was
closed on the 26th of the same month.   On August 14, 1855,
the justice decided the cause.   The judgment ordered was, that
the preliminary injunction, previously granted, should be made
perpetual, so as to restrain the construction of the proposed
rail road, intermediate the southerly line of Courtlandt, and the
notherly line of Reade street, on the ground found by the court,
that "intermediate Reade and Courtlandt streets, the construction
of the road would be a private nuisance, as respects these plaintiffs."   The preliminary injunction was " in all other respects
dissolved."   Subsequently to this decision Justice Cowles ordered a re-argument upon two propositions stated by him.   The
first of those questions was thus stated by Justice Cowles,
" assuming that the effect of running rail road cars through
Washington and Greenwich streets, intermediate Reade and
Courtland streets, would operate to obstruct the plaintiffs in
approaching their stores and places of business, as stated in the
opinion read to counsel in the case," have the plaintiffs a right
to an injunction ?   After such re-argument, and on September
27, 1855, his honor the judge delivered his opinion, ordering
judgment to be entered dissolving the preliminary injunction,
and dismissing the complaint herein.   The appellants insist,

I. The corporation of the city of New York had no power, in
any way, or by any act, legislative or executive, to authorize the
construction and use of this rail road.   It had such powers as
were *expressly* conferred upon it by its charter and by statute,
and such as were necessary to the exercise of its express powers, and no other power whatever.   The powers which it had it
could only exercise in the *manner* and for the *purposes* and
*objects* specified in its charter and by said statutes.   (2 *Kent,*

*5th ed.* 298.    *Angell & Ames on Corp.* 2*d ed.* 64, 69, 193, 200. *Dart. Coll.* v. *Woodward,* 4 *Wheat.* 636.    *The People* v. *The Utica Ins. Co.* 15 *John* 383.    *Hodges* v. *The City of Buffalo,* 2 *Denio,* 112.    *Berlin* v. *New Berlin,* 9 *Conn. R.* 175.    *Talmage* v. *Pell,* 3 *Selden,* 328.    *Broom's Leg. Max.* 198. 2 *Kent,* 290, 299.    *Milhau* v. *Sharp,* 17 *Barb.* 443.    *Head* v. *The Providence Ins. Co.* 2 *Cranch,* 167, 169.    *Milhau* v. *Sharp,* 15 *Barb.* 211.    *Bank of the U. S.* v. *Dandridge,* 12 *Wheat.* 68.    *Bank of Augusta* v. *Earle,* 13 *Pet.* 587.    *Angell & Ames,* 167. .   *Gaezler* v. *The Corporation of Georgetown,* 6 *Wheat.* 593, 597.    *Sharp* v. *Speir,* 4 *Hill,* 83.    *Thompson* v. *Schermerhorn,* 2 *Selden,* 92.    *People* v. *Trustees of Geneva Coll.* 5 *Wend.* 220.    *Att'y Gen.* v. *The Mayor &c. case, fols.* 442, 3, *Sup. Court, Gen. Term.    The People* v. *Sturtevant, case, fol.* 600.    *Davis* v. *Mayor &c. of N. Y.* 1 *Duer,* 508. *Brainard* v. *New London,* 22 *Conn. R.* 552.    *Hood* v. *N. Y. and N. H. R. R. Co. Id.* 16.    *Trustees First Bap. Church* v. *Brooklyn Ins. Co., N. Y. court of appeals, MS.*)

II.  The fee of the street in front of the plaintiffs' lots, was in the plaintiffs, subject to the public easement.  (*Willoughby* v. *Jenks,* 20 *Wend.* 96.    *John and Cherry streets,* 19 *id.* 659, 675.    *Gidney* v. *Earl,* 12 *id.* 98.    *Cortelyou* v. *Van Brundt,* 2 *John.* 357.    *Jackson* v. *Hathaway,* 15 *id.* 447.    *Chester* v. *Alker,* 1 *Burr.* 133, 145.    1 *Day,* 103.    *Livingston* v. *Mayor of N. Y.* 8 *Wend.* 85, 107.    *Adams* v. *Saratoga and Wash. R. R.* 11 *Barb.* 414, 452.    *Milhau* v. *Sharp,* 15 *Barb.* 193. *S. C.* 17 *id.* 435.    *Lade* v. *Shepherd,* 2 *Strange,* 1004.    *Barclay* v. *Howell,* 6 *Peters,* 494.    *Wyman* v. *Mayor of N. Y.* 11 *Wend.* 487, 502.    *Perley* v. *Chandler,* 6 *Mass. R.* 453. *Whitbeck* v. *Cook,* 15 *John.* 483.    *Trustees of Presb. Church* v. *Auburn and Roch. R. R.* 3 *Hill,* 567.    *Hammond* v. *McLachlan,* 1 *Sand. S. C. R.* 323.    *Herring* v. *Fisher, Id.* 344. 3 *Kent,* 433.    4 *Smith's Lead. Cas.* 90, *Amer. note.    Mohawk Bridge Co.* v. *The Utica and Sch. R. R.* 6 *Paige,* 562.)

III.  The evidence offered by the defendants in support of the title of the corporation in these streets, by showing, from an inspection of the records of the common council, its usage in

respect to laying pipes, &c. in them, was not only incompetent to prove such title, but was irrelevant, and should have been excluded by the court. The exception thereto, by the plaintiffs, should have been allowed and the evidence rejected.

IV. The land in the site of the street cannot be taken for the purpose of establishing a rail road, without making just compensation to the owners of the soil. (*Const. art.* 1, §§ 6, 7. *Trustees Presb. Society* v. *Auburn and Roch. R. R.* 3 *Hill*, 567. *Fletcher* v. *Auburn and Syracuse R. R.* 25 *Wend.* 462.)

V. If the *corporation* had power to authorize the construction and use of this rail road, it could only have been done by the passage of a proper *law* by the common council, and a *contract* made in conformity with such law by some officer or department in the executive branch of the corporation. It could not be done, as was attempted in this case, by the *legislative* branch of the corporation, alone, to the entire exclusion of the *executive* branch. (*Laws of* 1830, *p.* 125, § 1; 1849, *p.* 278, § 1; 1853, *p.* 410, § 1; 1830, *p.* 128, § 21; 1849, *p.* 280, § 9; 281, §§ 12, 13, 14; 283, § 19; 284, §§ 21, 23. *Christopher* v. *The Mayor &c. of N. Y.* 13 *Barb.* 567. *De Baun* v. *The Same,* 16 *id.* 392. *Milhau* v. *Sharp,* 15 *id.* 193. *S. C.* 17 *id.* 435, 440.)

VI. If the corporation could authorize this rail road by a law or resolution passed by the common council, without any thing being done by the executive branch of the corporation, the resolution in question can have no such effect, not having been duly passed by the common council. (*Laws of* 1830, *p.* 127, §§ 12, 13, 14; 1849, *p.* 279, § 6. *Const. of N. Y.* 1846, *art.* 4, § 9; 1822, *art.* 1, § 12. *Const. of the U. S. art.* 1, § 7, *sub.* 2, 3.)

VII. The resolution, as accepted, is, by its terms, if valid, both a grant of the necessary power to make the rail road, and a contract to make it. The making of such a contract is an executive duty, and could only be performed by the executive branch of the corporation. It is expressly forbidden to the common council, in the following language : "Neither the common council nor any committee or member thereof shall perform any executive business whatever, except such as is or shall be especially imposed on them by the laws of the state, and except

Wetmore *v.* Story.

that the board of aldermen may approve or reject the nominations of the mayor, as hereinafter provided." (*Laws of* 1849, *p.* 280, §§ 9, 13, 23. *Christopher* v. *The Mayor &c. of N. Y.* 13 *Barb.* 567. *Milhau* v. *Sharp,* 15 *id.* 212, 229, 232. *De Baun* v. *The Mayor &c. of N. Y.* 16 *id.* 392. *Milhau* v. *Sharp,* 17 *id.* 438. *Lawrence* v. *The Mayor &c. of N. Y.* 2 *id.* 577, 581. *Davis* v. *The Same,* 1 *Duer,* 508, 509. *People* v. *Sturtevant, N. Y. court of appeals, opinion of Johnson, J. p.* 13.) There is no analogy between authority exercised by the legislature, and that of one branch of a municipal corporation. (1.) The legislature represents the sovereign power of the state. (2.) It is not subject to the control of the courts in any way. (3.) It is not prohibited from performing executive acts ; but on the contrary does, by making grants of franchises, and other property, by concurring in and by making appointments, and in various other ways, exercise executive powers. (*De Baun* v. *The Mayor &c.* 16 *Barb.* 398, 399. *The People* v. *Compton,* 1 *Duer,* 512.)

VIII. The right to make and use this rail road was a grant of "*public property*," or of a "*franchise*," or of both, and could only be disposed of by the corporation " at public auction, and to the highest bidder, who will give adequate security." (*Laws of* 1853, *p.* 411, § 7. 3 *Kent, 6th ed.,* 458, 459. 2 *Bl. Com.* 37. *Beekman* v. *The Sar. and Sch. R. R. Co.* 3 *Paige,* 75. *Charles River Bridge* v. *Warren Bridge,* 11 *Pet.* 639. 2 *Steph. Com.* 14. 1 *Crabb's Real Property,* §§ 623, 698. 2 *Hilliard's Real Property,* 45–74. *The People* v. *The Utica Ins. Co.* 15 *John.* 358. *Milhau* v. *Sharp,* 15 *Barb.* 214, 228, 229, 230. *Stuyvesant* v. *Pearsall, Id.* 245. *Milhau* v. *Sharp,* 17 *id.* 439, 440. *Davis* v. *The Mayor &c. Superior Court, Gen. T., case, pp.* 217, 118. *S. C., Special T., case, pp.* 196, 107.) The decision in this case at special term, that this " is a mere permission revocable at the pleasure of the corporation," is directly in conflict with the terms of the contract, and with the well considered judgment of this court, and of the superior court at general term, and of the court of appeals.

IX. This resolution, as accepted, if valid, deprives the corporation, permanently, of its power to control and regulate the streets through which the rail road is to pass ; but the corporation cannot, by its own act, unless authorized by the legislature, deprive itself of this power. (*Milhau* v. *Sharp*, 17 *Barb.* 437, 438, 440, 442. *Attorney General* v. *The Mayor*, *Superior Court*, *Gen. T.*, *case, fol.* 445 *to* 457. *S. C.*, *Special T.*, *Duer, J., case, fols.* 388, 406. *People* v. *Compton*, 1 *Duer*, 551.)

X. The power of " regulating" the streets, which was formerly in the corporation at large, is now vested in the executive department, denominated the " street department," and it could not be taken from that department by any act of the common council. (*Laws of* 1849, *p.* 281, § 12. *Id.* 283, § 19. *Montgomerie Charter*, §§ 14, 16.)

XI. The power of the corporation to " repair" streets, is in the executive " department of repairs and supplies," and yet this resolution assumes to give that power, as to certain parts of the streets, &c. to the persons who are to make this rail road. This the common council had no power to do. (*Laws of* 1849, *p.* 281, § 13.)

XII. This resolution as accepted, if valid, gives to the parties named therein, an exclusive right to construct and use this rail road for their own profit. The corporation had no power to grant such a monopoly. (*Duer, J. Op. in the Superior Court. See the case, in court of appeals, of The Att'y Gen.* v. *The Mayor &c. fols.* 395, 396.)

XIII. This resolution is void, because, (1.) It deprives the corporation permanently of its power to regulate from time to time the rates of fare to be charged for the carriage of persons ; of which power the common council had no right to deprive the corporation. (*Milhau* v. *Sharp*, 17 *Barb.* 441. 2 *R. L.* 1813, *p.* 146, § 272.) (2.) It usurps the authority of the mayor to license carriages ; and in fact, confers licenses against his will, and in opposition to his veto. (*Milhau* v. *Sharp*, 15 *Barb.* 230. *S. C.* 17 *id.* 441. *Davis* v. *The Mayor &c. Superior Court*, *Sp. T.*, *Duer, J., case, fols.* 404–6.) (3.) It absolves

the grantees from an obligation imposed on all travelers by a statute of this state. (2 *R. S.* 424, § 198. *Att'y Gen.* v. *The Mayor &c., Superior Court; case, fols.* 423–5, 457.) (4.) It confers rights and exempts the grantees, their assigns and associates, from consequences, in a manner not authorized by the constitution or laws of this state. (*Att'y Gen.* v. *The Mayor. &c., Superior Court, Sp. T., Duer., J., case, fol.* 400; *S. C. Gen. T. fols.* 452–8. *Const. of N. Y.* 1846, *art.* 8, §§ 1, 3.)

XIV. Whatever interest in or power over the street rightfully belongs to the corporation; it holds the same as a trust, to be exercised for the public good; and the grant of these privileges for a trifling sum, with the right to demand five cents fare from travelers, when the trustees might have obtained a large sum for the grant, with a charge upon travelers of only three cents, was a palpable breach of trust, and a gross fraud upon the plaintiffs and all other tax payers, inhabitants and travelers in the city. (*People* v. *Sturtevant, case, fols.* 590, 595, 598. *Milhau* v. *Sharp*, 15 *Barb.* 214 *to* 218, 231, 232. *Milhau* v. *Sharp*, 17 *Barb.* 442, 444, 445. *De Baun* v. *Mayor &c. of N. Y.* 16 *id.* 292.)

XV. The court having found, as a fact, that "intermediate Reade and Courtlandt streets the construction of the road would be a private nuisance, as respects these plaintiffs," the judge erred in refusing to enjoin the construction of the road between those points. (1.) The plaintiffs, and all others similarly situated, have a right of action for the injuries done to their property by the construction of this road. (*Fish* v. *Dodge*, 4 *Denio*, 311, 316. *Drake* v. *Hudson River R. R. Co.* 7 *Barb.* 549. *Milhau* v. *Sharp*, 15 *id.* 214. 17 *id.* 445. *Tremain* v. *Cohoes Co.* 2 *Comst.* 163. *Hays* v. *Cohoes Co. id.* 159. *Rochester Co.* v. *City of Rochester*, 3 *id.* 463.) (2.) Having this right of action, they have a right to ask, and the court upon a case of this kind are bound to grant, an injunction to prevent, 1st. A prospective and irreparable injury to property. 2d. Multiplicity of actions. 3d. A purpresture or nuisance. (*Eden on Inj. by Waterman*, 259, 267, and notes. *Gardner* v. *Trustees of Newburgh*, 2 *John. Ch.* 162. *Corning* v. *Low-*

*erre,* 6 *id.* 439. *Livingston* v. *Livingston, id.* 497. *Law-rence* v. *Mayor of N. Y.* 2 *Barb. S. C. R.* 587. *Brower* v. *Mayor &c. of N. Y.* 3 *id.* 254. *See cases cited under* 17*th point.*)

XVI. The act of April 4, 1854, does not apply to or aid this case. (*Laws of* 1854, *p.* 323.) (1.) The rail road in question was not commenced within the meaning, spirit or intent of the law. (2.) The exception in the 3d section was obviously intended to relieve certain city rail roads, (such as the Second, Third, Sixth and Eighth avenue rail roads,) then in existence, against the prohibition of the two first sections. (3.) It is manifest upon reading the act, that it was not thereby intended to abrogate, in any way, the 7th section of the amended charter of 1853. (4.) By the judgment of this court, acting instead of a jury, it has been determined that this rail road, if constructed, would be a nuisance to the plaintiffs, which it cannot be pretended either the common council or the legislature has authority to erect. (5.) Assuming that this act creates a corporation for the construction of this rail road, (and which it does, if the defendants construe it rightly,) it clearly violates the constitution of this state. (*Const. N. Y. art.* 8, §§ 1, 2, 3. *Id. art.* 1, § 7.)

XVII. If we are right in all or any of the foregoing propositions, it is clear that the judgment of the special term should be reversed, and an injunction ordered, as demanded by the complaint. (*Att'y Gen.* v. *Aspinwall,* 2 *Myl. & Cr.* 613. *Att'y Gen.* v. *Corp. Pool,* 4 *id.* 30. *Att'y Gen.* v. *Dublin,* 1 *Bligh, N. S. River Dun N.* v. *Midland R. R. Co.* 1 *Railway Cas.* 154, 5. *Frewin* v. *Lewis,* 4 *Myl. & Cr.* 255. *Corning* v. *Lowerre,* 6 *John. Ch.* 439. *Gardner* v. *Trustees of Newburgh,* 2 *id.* 162. *Varick* v. *Mayor of N. Y.* 4 *id.* 53. *Livingston* v. *Livingston,* 6 *id.* 497. *Oakley* v. *Trustees of Williamsburgh,* 6 *Paige,* 262. *Pettit* v. *Shepherd,* 5 *id.* 493. *Bromley* v. *Smith,* 1 *Simon's Ch. Cas.* 8. *Lawrence* v. *Mayor of N. Y.* 2 *Barb. S. C. R.* 587. *Eden on Inj. by Waterman,* 259, 267, *and notes. Brower* v. *Mayor of N. Y.* 3 *Barb. S. C. R.* 254. *Roberts* v. *Anderson,* 2 *John. Ch.* 202, 204.)

*C. O'Conor,* for the defendants. The objections taken to the grant in question, may be placed under two heads : First, the plaintiffs assert that certain injuries will result therefrom affecting their private property or personal rights; and secondly, they allege that it involves certain usurpations of power and other public wrongs or offenses against the state or the public. And by reason of their being tax payers, the plaintiffs claim a right to maintain a private civil action in equity in their own names, to restrain such usurpations, and to prevent or remedy such public wrongs or offenses. Laying out of view for the moment the question whether any such usurpation, public wrong or offense is involved in the grant, or is likely to result from any action under it, and assuming, for the sake of the argument under the first head, that the rail road might become a public nuisance, we will investigate so much of the plaintiffs' case as rests upon the assertion that the rail road may, by possibility, work an injury to their private property, personal rights or business. They allege that Greenwich and Washington streets belong, in fee simple, to the owners of lots fronting thereon, subject only to the right of way over those streets existing in the public at large, and that a rail road, whether it be a nuisance or not, is a new, peculiar and exclusive use of their property, differing from the servitude as a highway with which it is charged in favor of the public ; and, consequently, such diversion of their property to a new use could not be made or authorized, even by the supreme legislature, without making them a proper compensation. They cite, in support of this position, *Gardner* v. *The Trustees of Newburgh,* (2 *John. Ch.* 162.) The conclusion is sound if the facts support it. If they are owners of the streets, and the public servitude in and over those streets does not embrace or include a right to use them for rail roads under the direction of the municipal authorities, then they have an undoubted right to say that this new use is an appropriation of their property which cannot lawfully be made without their consent, unless upon just compensation being made to them. This doctrine cannot be disputed. (1 *Yeates,* 169. 9 *S. & Rawle,* 32, 33. 3 *Watts,*

219.) We shall maintain, however, that the fee simple of those streets is not in the adjacent lot owners, but in the corporation; and even if the fee simple of the street be in the lot owners, still that the servitude is not that of a rural highway, but that of a city street, a distinction attended, as we shall show, with most important consequences. The fee holder, as we may term him, in a country road, has generally the whole interest in and profit of the land, except a right in the public to pass over the surface, and to perform such work upon it as may be necessary to keep it in repair. He has a right to all grass or other fruit produced upon it. He may plant trees upon it for his own use. (1 *R. S.* 525, § 127.) He may carry water pipes under it. (3 *Kent*, 433. 1 *Burr.* 143.) And, in short, he may make any other private use of it, or take any private profit from it, not absolutely inconsistent with the public right of passage. The servitude of a city street, when the fee is in a private person, is of a character far more comprehensive. The urban servitude confers upon the municipal authorities a right to pave the whole surface, so as to exclude the raising of grass, trees, or any profit of that sort; to restrain any disturbance whatever of such surface, or other private use of the street; to sink wells and erect pumps, lamp-posts and other like structures for public accommodations; to form subterranean sinks, drains or sewers; and to pass pipes beneath the surface for the purpose of supplying the inhabitants with water, gas, &c. In fact this servitude demands, to answer its object and purpose, the entire and exclusive use of the land upon or below the surface, and precludes any private use, occupation or employment of the space above. The adjacent lot owner cannot project a stoop, a bow-window, an awning or a sign-board, beyond the line of the street; neither can he construct a vault, cellar or cistern, beneath the surface. The uniform action of the municipal authorities, the uniform acquiescence of all persons in it, the uniform current of judicial opinion, prove this to be the common law of all our cities. Consequently it must be admitted that, when the fee of a city street is in private hands, it is unaccompanied by any present private right of enjoyment what-

ever. The whole usufruct is in the public. For all practical purposes, as a present interest, the fee is absorbed by the public use. It may subsist in contemplation of law, and possess capacity to quicken into life and become a valuable interest in case the highway should be discontinued; but this is a very remote and improbable contingency. The common law has always regarded such interests as of no account. The possibility of reverter, the contingent remainder, and the fee limited upon an estate tail, under the statute *de donis,* are instances of this. The first was never regarded as property, (2 *Kern.* 138;) the two latter were not only denied judicial protection, but encouragement was afforded to every device aimed at their destruction. (1 *Strange's R.* 295, 6. 4 *Kent,* 253.) The shadowy interest (1 *Call,* 186) resulting from this remote possibility, that the public use of a street might cease, has been repeatedly pronounced insignificant in the court of last resort. In *Livingston* v. *The Mayor,* (8 *Wend.* 87, 88,) the supreme court and court of errors unanimously confirmed a report of commissioners, taking for public use such a fee in land worth $32,000, at the nominal value of one dollar. Twenty years subsequently, the present court of appeals affirmed the same principle. (*Heyward* v. *The Mayor,* 3 *Selden,* 325.) We contend, therefore, that if the fee of the street is in the adjacent lot owners, compensation is not due to them for the use thereof as a rail road. No present interest or right of enjoyment on their part is affected by such use ; neither would it prevent or impede a reverter to them of the fee if the street should be legally discontinued. They part with nothing and can claim no recompense. (2 *Kernan,* 147.) Though, for the reasons just stated, we regard the point as no way necessary to our defense, still we insist that, under the evidence in this case, the corporation has the entire fee simple in the land occupied by Greenwich and Washington streets. The plaintiffs' counsel say it is " a *rule of the common law,*" that the lot owners abutting upon a street, road or highway, take the fee of the land to the middle of the road, *usque ad medium filum viæ.* There is no such general "rule of law." Who owns the fee of

any particular piece of land, be it a road, a street, or any thing else, is always to be determined by the evidence adduced in the case in which the question arises.    Tracing the title by patent and deed, devise or descent from the government to the present possessor, is the most certain legal evidence of title to land. But few examples of this certainty occur in practice; and the most usual evidence of title is possession.    Until countervailed by other evidence, this amounts to full proof of a title in fee. But possession itself cannot always be directly proven; it is often merely constructive or presumptive.    When the question arises between individuals as to the ownership of the fee in a road, if there be no evidence of a more certain character before the court, the common rules of presumption are necessarily resorted to for the purpose of ascertaining the fact.    The primary resort would naturally be to the fact of possession; but who can be said to possess a public highway?   "It is," says Justice Cowen, (20 *Wend.* 98,) "open and common to all the world, apparently, and as much so as to the adjacent lot owner."    At the same page, the learned judge states the origin and *rationale* of the law on this point.    To make out a constructive title to a road, the claimant "may prove himself to be in actual possession of the land adjoining."    It is thence *presumed* that he is owner of the soil *usque ad filum viæ*, "unless a contrary right be proven."    He says that such is undoubtedly the rule in England, citing Chief Baron Richards in *Cook* v. *Green*, (11 *Price*, 736, 739,) whose very words he adopts.    Ch. J. Hosmer, in *Watson* v. *Southworth*, (5 *Conn. R.* 310,) says : "It is a general rule of the common law, that the fee of the land over which a highway passes, is owned equally by the owners of the adjacent ground.   This rule, however, is not artificial, and of positive institution, but is founded on the presumption, *in absence of proof*, that the highway was laid out by the adjoining proprietors over their land in equal proportions.    This is not *presumptio juris et de jure*, but a reasonable presumption based on probability.    Where it appears, however, that the highway was laid wholly over the land of one person, the presumption is annulled."   And citing the

like opinion of Judge Edmonds, in *Peck* v. *Smith*, (1 *Conn. R.* 127,) he concludes that to hold otherwise "by inference against the fact," would be an inequitable fiction, countenanced by no "principle of policy or general convenience." (*See also* 1 *Conn. R.* 146, 147.) In 7 *B. & Cres.* 308, Mr. Justice Holroyd calls it a "*prima facie* presumption." The public highways formed an important department of the government in ancient Rome. They were made by the state, and belonged to it absolutely. (*Gibbon's Decline and Fall, vol.* 1, *p.* 66, *Lond. ed.* 1838.) For the legal and historical authorities, see the same volume, *note n, to p.* 67. The Penns, as lord proprietors of Pennsylvania, acted upon the same policy; and consequently, we find the supreme court of that state ignoring the presumption to which we have referred, in *The Philadelphia and Trenton R. R. Co.* (6 *Wharton,* 43, 44.) It would not arise in any country whose civil polity thus provided for the forming of roads, by the direct action of the supreme government, on the public domain, at the cost of the public treasury. But the common law had its birth in Saxon England, and history informs us that prior to the Norman conquest there were no public highways in that country, except four great roads made by the Romans during their military occupation. (18*th Encycl. Brit. tit. Way, p.* 820, *Edinb. ed.* 1797. *Id. vol.* 16, *tit. Road, p.* 304.) The English government not having concerned itself on the subject, and roads being indispensable, they came into being in early times, by dedication or other private act; and, upon this head, as most others having any connection with the progress of the country in the arts of civilization, it is quite difficult to trace to their origin, by a distinct line of authorities, the doctrines which we find recognized in the law of our own times. The learned editor of Bacon's Abridgment says : "It seems that anciently there were but four highways in England, which were free and common to all the king's subjects," meaning, as we presume, the four Roman roads before alluded to. He adds : "All others, which we have at this day, are supposed to have been made through private persons' grounds. (3 *Bac. Abr.* 493, *tit. Highways, A.*) The courts

have ever been the auxiliaries of social improvement; and it appears that at a very early period they applied the principle of dedication, which has been so frequently illustrated in our own country, owing to the sudden founding and rapid growth of cities. (10 *Mod.* 150. 6 *Peters*, 431. 19 *Conn. R.* 265.) From their being thrown open, it was held that the public acquired a right to use the roads thus dedicated, and that any interruption of such right being *ad communem nocumentum*, was an indictable nuisance. The adjacent proprietors, for their own sakes, scoured and kept clean the ditches by the road side. This practice was soon seized upon, declared to be an usage, and, by consequence, obligatory as a duty. (4 *Viner's Abr.* 504, *tit. Chimin Common, B.* 3. 3 *Bac. Abr.* 497, *tit. Highway, E. Id.* 498, *F.*) There is no instance in English jurisprudence of a contest between the government and an individual concerning title to the fee of a road. Indeed there could not well be. The government of England, properly so called, was never recognized as the source of title. The whole territory was parceled out to individuals by the king, or retained in his own hands as *his* property. In either case the title was in an individual. The *jus publicum*, or mere user as highways of the king's great rivers, or of roads laid out by him on his royal demesnes, or by other great lords on their's, was in the people, and the government was their trustee, to guard and protect it. (1 *Hume's Eng.* 217, *Lond. ed.* 1841.) It is only in controversies between the lord of the manor and the occupant of adjacent lands that we can trace the rise and progress of the doctrine now under consideration. In *Woolwych on Ways, p.* 5, (4 *Law. Lib.*) it is said to be presumed that the proprietor of the land adjoining an ancient road "gave up to the public for passage, at some former period, the land between his inclosure and the middle of the road." The author cites Bayley J., (7 *B. & Cr.* 306.) This, it will be seen, was only a presumption in accordance with the known truth of history. When, therefore, the lord of the manor owned the adjacent land, there could be no doubt as to the fee, and when he was found to have granted away the adjacent land, there

Wetmore *v.* Story.

being no just reason to suppose that he had intended to re-
serve the road, it was assumed that he had bounded his grantee
*upon* the road, and, as that word standing alone should be
construed, by the center line thereof. (1 *Sandf. S. C. R.* 341.
7 *B. & Cr.* 307, *per Holroyd, J.*) Thus the English judicial
practice came by very simple and natural steps to its conclusion,
that the occupant of the adjacent lands being *prima facie*
owner thereof in fee, he was also *prima facie* owner of the fee
to the center of the road, and had all the possession of that
portion of the road which was consistent with the public
use.   Their reasoning is best exemplified in the cases which
have arisen between manorial lords and adjoining proprietors
in respect to the ownership of strips of land lying between
the nearest inclosure and the highway.   In all these cases the
*same* presumption—and upon the same ground—has been allow-
ed in favor of the owner of the adjacent inclosure; but the lord
has been always allowed to displace it, if he could, by circum-
stantial evidence impugning the presumptive possession of the
inclosure-man arising from his proximity.   (*Grose* v. *West*, 7
*Taunt.* 41.   *Doe* v. *Kemp*, 7 *Bing.* 332.   2 *id. N. C.* 102.
*Steel* v. *Prickett*, 2 *Starkie*, 463.   *Doe* v. *Pearsey*, 7 *B. &
Cres.* 307.)   The title to highways in America is not involved
in the mist of remote antiquity; and there never was much
occasion to resort to the English books for a rule in respect
to it.   Every state in the union has adopted express statutes
for the laying out and establishment of highways; and, with a
very few exceptions, these statutes are so expressly worded as
to condemn to public use no more than the right of passage,
leaving in the proprietor every other interest in the soil.   The
provisions of our own state highway act, (1 *R. S.* 513,) fur-
nish a fair specimen.   Under such a course of legislation and
practice, the courts, *when no evidence to the contrary appeared,*
could not avoid drawing precisely a like inference to that which
arose under the English system, i. e. that he who owned the
land on each side of a highway had the fee of the highway
itself, and that opposite lot owners respectively held to the
center of the road. (2 *John.* 363.   12 *Wend.* 98.   4 *Iredell's*

*Law R.* 320.   *U. S.* v. *Harris,* 1 *Sumner,* 34; *and opinions of the Att'ys Genl. U. S.* 777, 816, 845.) Independently of any thing said in the English authorities, our courts could not have arrived at a different conclusion. But it is quite clear that when the title to the adjacent lot is put in evidence, and its boundary on the road is shown not to extend into the road bed, the presumption which might else arise in favor of the lot owner is displaced. See the remarks of Ch. J. Hosmer, (5 *Conn. R.* 310, *above cited ;*) also *Union Burial Ground* v. *Robinson,* (5 *Wharton,* 23 ;) the cases cited by Mr. Beardsley arguendo, 4 *Hill,* 370 ; *Jackson* v. *Hathaway,* (15 *John.* 453 ;) *Tyler* v. *Hammond,* (11 *Pick.* 213,) and Mr. Justice Story's comment on the last two cases, in 1 *Sumner,* 31, 32; *Hare & Wallace's note to Dovastan* v. *Payne,* (2 *Smith's Leading Cases,* 143, 44 *Law. Lib.*) This was the very point ruled in the case of *Willoughby* v. *Jenks,* (20 *Wend.* 96,) on which the plaintiffs rely. *John and Cherry Streets,* (19 *id.* 659,) also cited by the plaintiffs, contains nothing favoring their views. It was admitted that the streets belonged to private individuals, and not to the corporation. (*Id.* 667.) And Judge Cowen says, at page 670, that in the absence of evidence or even *" argument"* to the contrary, he felt bound to presume that the street belonged to the adjacent owners. It will be seen, therefore, that the claim of adjacent lot owners to the fee of the street—*ad medium filum viæ*—like every other question of title to land, depends upon the evidence given in the particular case, and the ordinary legal rules of presumption applicable to the facts proved.

Let us, then, refer to the proofs in this case : Washington street was formed, at quite a recent date, upon the land under water which was granted to the corporation by the 38th section of its charter. (*See Montgomerie's Char.* § 38; *Davies' Laws,* 193.) Greenwich street is shown to have come into being as a road along the water's edge *within* 100 years. The same charter, which, be it observed, is more than 100 years old, (§ 37,) granted to the corporation all the " unpatented and unappropriated land lying and being within the said city of New York

and on Manhattan's Island aforesaid, extending to the low water mark." Thus we show a title to both streets in the corporation, derived directly from the sovereign or fountain and source of all title, unless a prior patent or appropriation existed, or the corporation has subsequently granted them. (*Hoffman's Treatise, Appendix note,* 47.) The existence of such grant is an affirmative, the burthen of proving which rests upon the plaintiffs, and they have made no attempt whatever to maintain it. (2 *Kern.* 242.) They repose upon a mere present possession *alongside of the street,* and claim, *as against the government of the city,* that they are thence to be presumed to have a grant of the street itself from the government. For this pretense there is no color. But let us give them all the benefit of treating the question upon the precise basis of a controversy in England between an adjacent lot owner and the lord of the manor, concerning the title to a road. Even there no presumption arises in favor of the adjacent proprietor, except that resulting from a sort of "*constructive* possession" of the road, as Judge Cowen calls it. (20 *Wend.* 98.) Evidence is admissible on this, as on all questions *in pais.* (*Cooke* v. *Green,* 11 *Price,* 218.) *Woolwych on Ways, p.* 5, says, that "Acts of ownership exercised by the lord may be admitted to repel" this presumption in favor of the lot owner. *Grose* v. *West,* (7 *Taunt.* 42,) as well as the decision and very pertinent remarks of Bailey, J. at nisi prius, in *Headlam* v. *Hedley,* (1 *Holt,* 464,) fully sustain him. The same writer says, at p. 8, "Taking the profits is the best badge of ownership. The cases may be well reconciled by setting up the presumption of ownership in the adjoining proprietors in the first instance, subject to be defeated by a prescription, or well founded custom, on the part of the lord of the manor." Lord Mansfield fully discusses, on principle, the question of title between the lord and the adjoining owner, in *Lofft's Reports,* 359. He says: "Where is the first presumption on the naked strict abstracted case? I think on the reason of the thing, when the naked presumption stands stripped of evidence, that it is in the owner of the land on each side." But this is only such a presumption as is not like a title. "How does the presumption

stand in favor of the lord?"   He mentions some circumstances, and among them that one of the tenants *agreed to pay the lord five guineas for gathering coals on the soil,* and adds, " This is strong evidence."   The judge, at the trial, had instructed the jury that the evidence in favor of the lord was not strong enough to repel the presumption.   The court thinking otherwise, awarded a new trial.   In *Doe* v. *Pearsey,* (7 *Barn. & Cres.* 308,) Holroyd, J. says: "Evidence may be given to rebut the *prima facie* presumption."   Littledale, J. says: "If any act of ownership by the lord of the manor be given in evidence, then there will be an end of the presumption."   This being the law of the case, we ask how stands the evidence.   The corporation has, "time out of mind," regulated and controlled the use of the streets' above and below the surface.   It has regulated the walks, the extent to which adjacent proprietors might form stoops, bow windows, signs, awnings and awning posts, and every other use of the street.   It has allowed the soil to be subverted for Manhattan water pipes, Croton water pipes, gas pipes, sewers and the like.   It has exacted from the adjacent proprietors compensation for licenses to use the soil beneath the street for private vaults ; and every one of the plaintiffs in this action have submitted to that very exaction.   An attempt was made to weaken the conclusion deducible from this admission by suggesting that it was a mere arrangement between the municipal government, as trustee for the public right of way, and the owner of the fee, the latter allowing to the former a premium for the temporary interruption of the right of passage.   This construction is inadmissible.   The corporation of New York has statutory power to discontinue a road or street; but whilst it continues a public highway, neither the corporation nor any individual can, for an instant, appropriate it to any *private* use. Therefore it cannot lawfully be presumed that the plaintiffs paid the corporation to collude with them in violating law, or, in other words, bribed it to wink at a misdemeanor.   This technical answer would suffice ; but more conclusive answers can be given.   Many of the cases cited in this argument show that an adjacent lot owner, when building, may temporarily inclose a

part of the public highway in front of his work. This is allow-
ed by the common law, upon its own sound and conservative
policy. It is allowed for the public good. Buildings are need-
ed, and the erection of them subserves the common weal; their
erection on the highways' verge exposes passers-by to the dan-
ger of falling into the excavation, or being wounded by the ac-
cidental falling of materials upon them. To aid in effectually
guarding against such mishaps, the law wisely allows this tem-
porary inclosure of a reasonable part of the highway. (4 *Ad. &
Ellis*, 384. 31 *Eng. C. L.* 97.) In New York this practice is
regulated by the corporation, and nothing has ever been charged
for a license to incumber the streets whilst building. A con-
clusive circumstance remains to be noticed. The charge for
vaults, &c. is so much per *cubic* foot of the space occupied.
This shows that it has relation to the use of the *fee.* If it had
reference to the interruption, it would be graduated by the su-
perficial measure merely. This is *conclusive* evidence that the
adjacent lot owners are not, and that the corporation is, *in pos-
session of these streets ;* and such possession coincides with the
sovereign grant in fee simple *to* the corporation; and thus the
title of that body to the fee of the streets is placed beyond a
doubt. If it were necessary to fortify these proofs of title in
the corporation, it could easily be done. The public history of
the country may be taken notice of by the court, and forms a
proper element of decision. (3 *Howard's U. S. R.* 24.) This
colony was first settled by Holland, and was consequently gov-
erned *de facto*, at the time of its settlement, by the civil law.
"It is the undoubted rule of that law that highways, *viæ pub-
licæ*, belong to the sovereign power as part of its royalties or
public rights. They belong to it absolutely ; there is no right
in the adjacent owners, to the soil of the road either during the
use or upon its discontinuance." (*Hoffman's Treatise*, 258.)
The same work, tracing the history of our laws from the Don-
gan charter to the adoption of our present street system, shows
that the practice of vesting the fee simple of the streets in the
municipal government has been uniformly adhered to in this
city. (*Id.* 269 *to* 276.) The only difference between the Dutch

rule with which this history begins, and the English colonial and state practice which succeeded it, is this: Instead of retaining the title to public ways in the supreme government, it has been vested in the municipal government. (*See act of March* 7, 1793, *cited in Hoff. Treat. p.* 274.) This difference is only modal, and has its origin in the difference between the civil and common law *practice* touching public ways. The English charters granted all existing public streets and ways to the corporation; the provincial act, October 9, 1691, (1 *Smith & Liv.* 12,) which was re-enacted by the state law of April 16, 1787, (1 *Greenl.* 441,) gave the corporation the fee simple of all new streets which they might open. (*See Heyward* v. *Corporation,* 3 *Selden,* 314.) This system has been matured and perpetuated by the subsequent legislation now in force. (2 *R. L. of* 1813, *p.* 414. *See remarks of Jones, P. J.* 7 *Barb.* 536.) If the charters of the city, and such facts as have been shown in this case, had been presented to the supreme court in the *John and Cherry streets case,* (19 *Wend.* 667, 675,) the learned judge would not have complained that he was left to grope in the dark without evidence, reason or argument, and probably he would not have applied to an ancient street in the city of New York the wholly inapplicable doctrines which govern in controversies between an English manorial lord and his tenants, or those arising under a system so very different as the statutes for the establishment of rural highways. In referring to the temporary local law existing during the hostile and wrongful occupation of this island by the Dutch, we do not mean to claim, in opposition to what is said in 5 *Wend.* 445, that the rules of the Dutch civil law acquired any foothold *as law* in this state. We refer only to the *fact;* and the fact is that this city was settled by the Dutch; that when the first lot owners or lot holders upon streets or highways entered into possession, it was understood between them and the power which made their allotments, that they took only to the side line of the streets, and nothing *in* the streets. It is the fact that streets and roads were formed, and that the city was built on this understanding; and that when Britain expelled the intrusive power of Holland and re-

Wetmore v. Story.

sumed her lawful possession, she adopted the existing settlement with its existing customs, and, in this particular, repeatedly and solemnly ratified and sanctioned them by the charters and acts of legislation to which we have referred. If aid were needed, these facts come in aid of the presumption that lot owners in the city of New York never had, or claimed, any title or interest of any kind in the streets of the city in front of their lots. Independently of any title in the soil of the streets, the plaintiffs object to the establishment of a rail road in Washington and Greenwich streets, on the ground that the mode in which they now use those streets, between Laight and Liberty streets, must, in that event, be discontinued; and that such discontinuance will lessen the rent and impair the value of their lots. The only injury to their stores and lots which they point out is, that the rail road will produce a difficulty of "*backing up*" carts against the curb stone as usual. The evidence shows that butchers, cartmen, and others in that vicinity, now keep their horses and carts backed against the side walks, and otherwise standing idle and unemployed a large portion of the day; and that most of the dealers there occupy parts of the street as places of deposit and sale for their goods. No grievance to the plaintiffs can arise from the suppression of these practices. The practices, so profitable to the plaintiffs, by which Washington and Greenwich streets are diverted from the public use as highways, and converted into additions to the stores of the dealers therein, or places of deposit for their carts and of rest for their horses, are indictable as misdemeanors. Their forcible suppression, however unprofitable to the plaintiffs, will be the abatement of a public nuisance and a highly meritorious act. (14 *Conn. R.* 318.) To establish this position, we refer to the following cases : *Rex* v. *Cross*, (3 *Camp.* 226;) *Rex* v. *Jones*, (*Id.* 230;) *The King* v. *Russell*, (6 *East*, 427;) *Rex* v. *Carlile*, (6 *Car. & P.* 636;) *Dovaston* v. *Payne*, (2 *H. Black.* 529;) 2 *Smith's Lead. Cas.* 90, 4 *Law Lib.*; *Fowler* v. *Saunders*, (*Cro. Jac.* 446.) All this doctrine is fully confirmed by the supreme court of this state in *The People* v. *Cunningham*, (1

*Denio*, 524.)    See also *Burnham* v. *Hotchkiss*, (14 *Conn. R.*
317, 318.)

In respect to rivers, which are public highways, this same
question has undergone discussion, and led to a very instruct-
ive conflict of judicial opinion in England.   The doctrine which
ultimately prevailed was, that a public highway was for *pass-
ing and repassing*, and that no obstruction or diminution,
however slight, of its capacity for that identical use, could be
tolerated, even though such obstruction was beneficial to the
public *in other respects.   (See The King* v. *Russell et al.*, 6
*B. & Cres.* 566.   *Respublica* v. *Caldwell*, 1 *Dallas*, 150 ; *Acc.*
14 *Conn. R.* 323.   *The King* v. *Ward*, 4 *Ad. & Ellis*, 384.)
It therefore seems that, at common law, a public highway,
whether a river or a street, cannot lawfully be appropriated to
any private use on any consideration whatever, nor in any way
interfered with by private authority, even for a public use, un-
less indeed by some act which facilitates passage and repassage.
Of course, the legislature may vary the use; but that is only
because it has power to *change the law.   (King* v. *Pease*, 4 *B.
& Ad.* 30, *end of case.*)   The plaintiffs claim, however, that
even if they have not the fee of the street, yet that in virtue of
their frontage upon the street, an interest in the street, in the
nature of a private way, is an incorporeal hereditament apper-
taining to their lots ; and that, if the rail road should be a
nuisance, it would be an interruption or invasion of such *private*
right.   We concede that there may be a private interest of this
kind in a public street.   But it is a very special kind of inter-
est ; and for that reason it requires precise proof.   (12 *Wend.*
173.   1 *Man. & Gr.* 484, 392.)   It cannot be inferred from the
mere fact of proximity ; and no attempt whatever has been made
to prove it.   That the owner of land adjoining a public high-
way has some interest therein, *merely by reason of his prox-
imity*, is a vulgar error which has been extensively prevalent.
(1 *Conn. R.* 146, 147.)   It was distinctly brought to the test,
and condemned as a heresy, by the court of last resort in *Gould*
v. *The Hudson River R. R. Co.* (2 *Selden*, 541.)   We have
already shown the strict legal analogy which exists between

highways on land and on the water.    (*See* 21 *Conn. R.* 325 ;
11 *Barb.* 452.)

No doctrine is more firmly settled upon authority than that,
for a public nuisance, the government alone can prosecute.
Many authorities will be cited to that effect.    We will offer a
few in this connection, because their peculiar circumstances
give them a bearing on the question immediately before us.
In each of the following cases it is said that those who do not
suffer by a violation of law, otherwise than as members of the
community, cannot maintain any remedial action.    (*Harkness*
v. *Waldo, com.,* 26 *Maine R.* 356.    *Clerk* v. *Saybrook,* 21 *Conn.
R.* 326, 7.    *Smith* v. *Boston,* 7 *Cush.* 255.    *Mountvernon* v.
*Dusouchet,* 2 *Carter's Ind. Rep.* 588.    *Sutherland* v. *Jackson,*
30 *Maine R.* 466.)    If a public nuisance work a private injury
to a particular person, that person may have a remedy by pri-
vate action for damages, and in a proper case may have an
injunction.    This we admit unqualifiedly ; but the question re-
mains, what effect of a public nuisance in the highway will, in
judgment of law, work a private injury to an adjacent lot
owner.    A noisome odor issuing from a nuisance, placed in the
public highway, will have this effect, because it is not confined
to the public property, viz. the highway.    It pervades the sur-
rounding atmosphere, enters the adjacent premises, and either
endangers health or disturbs the comfort of those dwelling
therein.    (5 *Barb.* 86, *and cases cited.*)    A noise upon the pub-
lic highway, in like manner, penetrates the premises adjoining,
and disturbs the occupant.    (*Id.* 87, *and cases cited.*)    Proba-
bly these are the only instances in which a nuisance in the
public highway can work a particular injury to a private individ-
ual *merely in virtue of his proximity.*    And, in these cases,
actual contiguity of the lot and the highway is not material.    It is
enough that the lot, whose owner complains, lies near enough to
the nuisance to be specially affected by it.    (*Whitfield* v. *Ro-
gers,* 26 *Miss. R.* 87.)    The only other cases in which a pri-
vate injury may result from a nuisance in a highway, are those
where the actual *passage* is thereby interfered with.    For in-
stance, if an obstruction cause one to fall and injure his person,

or break his carriage, or injure his horse, a special action lies. If, by means of an impediment on a public highway, a man is arrested in his progress over it, and put to expense, this is a special damage for which a private action will lie. See in point the able opinion of Ch. J. Shaw in *Smith* v. *Boston,* (7 *Cush.* 255.) See the observations of the supreme court of Connecticut precisely in the same tenor in 17 *Conn. R.* 376, *point* 2. See also *Rose* v. *Miles,* (4 *Maule & Sel.* 104 ;) *Pierce* v. *Dart,* (7 *Cowen,* 611 ;) *Dougherty* v. *Bunting,* (1 *Sandf. S. C. R.* 4.) It will be seen that these cases of special damage which entitle one to an action are all cases of actual injury, and that they all arise in the exercise of the common right of passage which belongs equally to every citizen, and which is, in no respect, peculiar to the adjacent proprietor. The right of action for such an injury is no *less* perfect because the plaintiff resides, or because his only property lies, 100 miles distant from the *locus in quo ;* nor is it the more perfect because he happens to own an adjoining lot. The *gravamen* of his complaint—its whole essence—is, that he had a right of passage, was hindered from using it, and thereby suffered a special injury. It is quite clear that, in some cases, a lot holder may have rare occasion to use an adjoining street. He may own no horse or carriage, nor be resorted unto by those who do. A couple of feet in the footpath may be all he needs, whilst all his neighbors in an adjoining cross street may have hourly occasion to pass his door with their horses and carriages. In such a case an obstruction in the cart way would be no injury to him, and a great injury to them. Yet it would be no private cause of action for either, so long as the injury was *merely in contemplation.* These considerations—and they might be illustrated to any length—show that proximity of landed property to the *locus in quo* does not enter into the question, what is a private injury from *an obstruction* in the public highway, which will give an individual a right of action. It will be seen, therefore, that in case of a nuisance by *obstruction* of a public highway, a *private* person can have no action, except for an actual injury received. The mere apprehension that a private injury may be received by

one who thinks himself more likely to suffer prejudice than others, affords no foundation for an appeal to the preventive justice of equity. (*Irwin* v. *Dixon*, 9 *How. U. S. R.*, *foot of page* 27, 28.) An injunction cannot be allowed to prevent an obstruction in a highway on the apprehension that the plaintiff may happen to desire to pass, and may possibly be impeded. (*Anon.* 3 *Atk.* 750.) It is not allowable to mount conjecture upon conjecture in this way.

A single decision of Chancellor Kent has been cited in support of the doctrine that an adjacent lot owner may have a private action to restrain an obstruction of the street on which he fronts. He says : "The obstruction was not only a common and public nuisance, but worked a *special* injury to the plaintiffs." (*Corning* v. *Lowerre*, 6 *John. Ch. R.* 439.) Although this decision was made by an eminent judge, it was made upon an *ex parte* argument, and therefore it is of little weight as authority. It may be also that the bill contained some special facts not stated in Mr. Johnson's very brief report. If the learned chancellor intended to affirm that mere contiguity to a highway gave to a lot holder a private interest in the road distinct from that of the public, his decision was inconsistent with that of Chief Justice Shaw in 7 *Cushing*, 255, and with *Jackson* v. *Hathaway*, (15 *John.* 447,) and was overruled by *Lansing* v. *Smith*, (8 *Cowen*, 148 *to* 150 ; 4 *Wend.* 19 *to* 24,) and again by *Gould* v. *Hudson River R. R. Co.* (2 *Seld.* 541.) The pretense that an adjacent proprietor suffers, in judgment of law, any special injury from the mere existence of an obstruction to a highway, is also well answered by the supreme court of a sister state, in *Seeley* v. *Bishop*, (19 *Conn. R.* 135.)

We now proceed to the second set of objections presented by the plaintiffs. They assert: 1st. That this rail road will be a *public* nuisance. 2d. That, in establishing this rail road, the corporation was guilty of an usurpation of powers not vested in it, because it has thereby "attempted to grant powers, privileges and immunities of a public nature, which cannot lawfully be exercised without the authority of the legislature ;" because "it has attempted to limit and abridge the future exercise of its

own legislative powers over two of the principal streets and most important thoroughfares of the city;" because it has thereby attempted " to usurp the power of the mayor to license carriages, or to compel him to give licences against his will ;" and because it has attempted " to absolve the grantees from the obligation" to turn their carriages to the right when meeting other carriages, "which is imposed upon them by a statute of this state." 3d. That the corporation, in making the grant in question, was guilty of a breach of its public trust and duty in not accepting the offer of Lynch and his two associates to pay $40 per annum for each car, and to charge each passenger only three cents, instead of the defendants' proposal, which was to pay $20 per annum for each car, charging passengers five cents. 4th. That the corporation exercised its powers in an irregular manner and in violation of the statutes enacted for its government, in the following particulars, viz. that the grant being in itself, so far as the corporation was concerned, a complete and perfect contract, was not a legislative act, and consequently not within the " legislative power" of the common council ; and if it was within such power, then that the aldermen in office in 1853 could not lawfully act upon and confirm a resolution passed by the assistants of the year previous ; that the grant was substantially a contract to perform work for the corporation, which could only be made by an executive department, and which the common council was prohibited from making by the amended charter of 1849, § 23 ; that it was an attempt to sell a franchise and property of the corporation otherwise than " at auction and to the highest bidder," contrary to the amended *charter of* 1853, § 7 ; and, lastly, that the rail road would be a particular and exclusive use of streets of which " all citizens were entitled to a free and common use." This formidable list of objections is taken from the plaintiffs' printed points. We have thus grouped them under one head, because they all go upon some alleged violation of a *public* duty—some alleged usurpation of powers not granted, or illegal exercise of them. All these being matters with which no private individual has any concern, and which the state alone can complain of, we wish to present pre-

Wetmore *v.* Story.

liminarily our protest against their being noticed, or at all considered in this case. Until very recently it was part of the *A, B, C,* of the law—and every where beyond this district it is still so—*that no private action* can be maintained by an individual for a public offense, or any wrong against the state. Public nuisances were subject to indictment; and, in aid of the courts of law, *equity*, at the suit of the government, would grant injunctions to restrain them. Usurpations of powers or franchises by corporations or individuals, were subject to the jurisdiction of the king's bench or supreme court by prohibition or quo warranto, or information in the nature of a quo warranto. Equity might, perhaps, lend its auxiliary remedies, if needed, even in such cases. Breaches of *public* trusts by corporations, or public bodies, or functionaries, might be restrained and corrected by equitable action prosecuted by the state, in its own name, or by its attorney general. Had this still continued to be, as is said in 19 *Conn. R.* 135, " too familiar to require a reference to authorities," our argument might end here. But we are told that any one who pays taxes may arraign the municipal authorities at the bar of the civil courts for each and every of their acts affecting the public interests, in a civil suit, and compel them to justify their motives, as well as the expediency and the strict legal regularity of all their proceedings. But that this doctrine has been sanctioned in high places, it might be treated with levity. We proceed to show how it *now* stands upon authority. The notion that a tax payer, *as such*, could file a bill in equity, or maintain any suit against a municipal corporation or its grantees, for misuser of its powers, excess of authority, or other violation of its public duty, was first presented to this court in 1847. (*Adriance* v. *The Mayor*, 1 *Barb. S. C. R.* 19.) The case was heard, *ex parte*, at special term, on a bill taken *pro confesso*. Edmonds, J., doubted the jurisdiction; but, *as there was no defense*, he declined to dismiss the suit, " *mero motu*," as he expressed it. The point was distinctly presented to this court, at a general term held before Edwards, Roosevelt and Mitchell, Js. The first expressed the opinion that a tax payer could

maintain the action ; the second concurred in the general re-
sult ; Mitchell, J., dissented from the result, but expressed no
opinion on this point. (*Christopher* v. *The Mayor &c.* 13
*Barb.* 571.) The question next came up in the superior court,
on the aldermen's contempt procedings in the Broadway rail-
way case. (1 *Duer*, 475, *point third.*) Mr. J. Bosworth, at
p. 507, expressed an opinion *against* the right ; but as the
plaintiffs rested their case, in part, on an alleged injury to their
private property, it did not become necessary *then* to decide it.
(*See observations of Duer, J., in* 2 *Duer*, 664, 665.) In *Mil-
hau* v. *Sharp*, (15 *Barb.* 219,) Edwards, J., adhered to his
former opinion ; Strong, J., said nothing on the point ; Morris, J.,
who had himself, as counsel for the plaintiff, argued the Christo-
pher case in 13 *Barb.* 567, while he dissented from the decision,
observed silence on this particular point. In *De Baun* v. *The
Mayor*, (16 *Barb.* 393,) Mitchell, J., declined as in the Chris-
topher case to express his opinion, but treated the question as
settled upon authority in this district. Judge Roosevelt, at
p. 401, admits it to be a new practice to allow a tax payer to sue.
But he had allowed the injunction in the Christopher case, and
he disposed of the want of precedent, as follows : "The whole
history of the common law is a history of *unheard of* proceed-
ings. Its leading principle, and its chief recommendation, are
its power of adapting itself to the ever-varying changes of so-
ciety ; and, if *unheard of* grievances arise, *unheard of* reme-
dies, if necessary, may be applied." The last mentioned case
was heard before *five* judges. Two of them, Edmonds and
Morris, Js., dissented. Where the majority is slender, the
authoritative force of a decision is lessened. (*Per Marshall,
Ch. J.,* 4 *Cranch*, 376.) Morris, J., at p. 411, strongly and de-
cidedly holds that a *tax payer*, as such, cannot maintain a suit
to restrain corporate abuse of power *in a street case.* He says :
"The point presented that a private citizen cannot institute
proceedings against a municipal corporation to restrain excess
of jurisdiction, but that such suit must be instituted by the
attorney general, is well taken." Harris, J., in *Milhau* v
*Sharp*, (17 *Barb.* 445,) avoids the point, and puts the case on

the ground that the illegality of the act, coupled with the consequential injury to the plaintiffs' *private property*, gives them a right of action. He was probably quite mistaken in supposing that, upon the proofs before him, the plaintiffs had shown any *private* injury. That, however, is not material to the present inquiry. The Broadway rail road case was brought to a final hearing in the superior court, before Duer, J. He held that the plaintiffs had established no private injury to themselves ; and it then became of vital importance to determine whether, *as tax payers*, they could maintain an action for the supposed public injury. He directed the question to be reargued, and after the re-argument, in a very able and conclusive opinion, he held that the state alone, by its attorney general, could maintain the action. (*Davis & Palmer* v. *Mayor*, 2 *Duer*, 664.) The plaintiffs acquiesced in this decision. The result of this review is as follows : Edwards and Roosevelt, Js., have held that a tax payer may sue. It is possible that Mitchell and Strong, Js., may be regarded as having, to some extent, acquiesced. On the other hand, Edmonds, Morris, Bosworth and Duer, Js., have expressly and distinctly held the contrary. Voices appear to be about equal. The judgment of the superior court is last, and is adverse to the right claimed. We submit that the review in 2 *Duer*, 664, of the Christopher case, in this court, is most satisfactory. (2 *Sandf. S. C. R.* 52, *and* 10 *How. Pr. R.* 523.) Judge Duer reposes on the English cases ; but there are also very controling authorities on this side of the Atlantic which fully support his conclusion. (*Beveridge* v. *Lacey*, 3 *Rand.* 63. *Seeley* v. *Bishop*, 19 *Conn. R.* 135. *O'Brien* v. *Norwich and Worcester R. R. Co.* 17 *id.* 376. 14 *id.* 578, 579. *State* v. *The Corporation of Mobile*, 5 *Porter's R.* 312, 313, 293.) To which we add, as a conclusive authority, the judgment of the supreme court of the United States directly on the point. (*City of Georgetown* v. *The Alexandria Canal Co.* 12 *Peters*, 98, 99, 100.) In that case, it was expressly decided that a city corporation, or *all the citizens thereof united, in their individual capacities*, could not maintain an action for the obstruction of a public high-

way therein. "The complainants," says the court, "must, as in the case of private persons, to maintain their position in a court of equity for relief against a public nuisance, have *averred and proved* that they were the owners of property liable to be affected by the nuisance, and that, *in point of fact,* it was so affected, so that they *had thereby suffered* a special damage." We submit, on this review of the authorities, that the weight of judicial opinion, even in this district, is *now* against the plaintiffs on this point. And, as a consequence, the plaintiffs must fail, unless they have established that the construction of this rail road would work an injury to some private right of property vested in them. If it tends to create a public nuisance—if it involves an usurpation of powers, an irregular exercise of them, or the breach of a public trust on the part of the corporation—the state alone can complain. It was suggested that if this point should be ruled against the plaintiffs, they ought to be allowed to amend. This is a very singular proposition. Where a party, having no right of action whatever, succeeds in raising a doubt, whether somebody else may not have a right, the true course to be pursued would seem to be very clear. Let him who has the right bring his action if he will, or acquiesce, if he pleases. What right has a stranger to interfere between the trespasser and the trespassed against? (14 *Illinois R.* 446.) This is not the case of a party having a right of action, whose suit is incapable of being fairly decided without the presence of other parties, and who is, therefore, allowed to make it perfect by introducing such parties. (4 *Peters' U. S. R.* 202. *Reid* v. *Vanderheyden,* 5 *Cowen,* 733.) It is not a defect of parties, but a defect of any right in the plaintiff to sue at all. After introducing the state, or the attorney general, as plaintiff, the action would be dismissed as to the present plaintiffs; for, conceding it to be true that a public and a private injury may be prosecuted in a joint action by the state and an individual, here there is no private injury; and consequently no title of any kind in these plaintiffs. The state can sue whenever it pleases; it may waive complaining altogether. It belongs to the executive department to determine

Wetmore *v.* Story.

when to sue, how to sue, and whether to sue at all, unless quickened by a legislative mandate. (14 *Illinois R.* 446.) Has the judiciary any authority to push it on to its duty? Has a mandamus ever been allowed in such a case? We must admit that the superior court, when deciding against the plaintiffs in the Broadway rail road case, gave leave to amend by bringing in the attorney general as a plaintiff. (2 *Duer*, 670.) But this is a single decision of a single judge, and appears to have been made without argument; and when it is considered how reluctant the judge must naturally have been to dismiss the complaint as groundless, after having committed the whole corporation for its contempt in disobeying the injunction, this novelty is not to be wondered at. Chancellor Kent says that there is a description of cases which "make bad precedents; they excite the passions, and seduce the judgment." (12 *John.* 53.) Perhaps this was one of them. "Bad precedents" should be forgotten, not followed. This looking into the influences which may have disturbed the judicial mind, is sanctioned by the supreme court of the United States in 10 *Peters*, 265, 266. It finds some warrant in the recent most elaborate and judicious opinion of the superior court itself, pronounced by Duer, J., in *Woolsey* v. *Judd*, (11 *How. Pr. R.* 67.) But if (all argument and authority to the contrary notwithstanding) Messrs. Wetmore, Stuart and Hoppock, as tax payers, on the strength of certain precedents in this district, are to be permitted to prosecute on behalf of the people of the state, then we say that, *on the merits*, the people have no cause of action.

We deny that this rail road will be a public nuisance. A modern city rail road is manifestly, in its own nature, only a particular method of paving, or forming a way, and transporting carriages over it. It is not necessarily exclusive, any more than the use of the street by a coach and six, or the division of roads into cart way and side walk. The latter absolutely excludes all vehicles, and even horses, from a part of the road over which, but for such division, they might lawfully pass. The rails may be laid, and the propelling power used, upon a road of given width, in such a manner as to render any other

use of the road impracticable. Perhaps, in point of fact, country rail roads are generally so constructed and conducted. But, on the other hand, it is believed that, in the establishment of rail road transportation upon a highway, the rails may be so laid, the power so applied, and every attending incident of the operation so managed, as not to preclude any class of persons or useful vehicles from their accustomed privileges. If so, the rail car and motive power are mere modifications of the pre-existing use, or the introduction of a new method of accomplishing the precise object of the highway, viz. the transportation of persons and property. Consequently it cannot be a *proposition of law* that the establishment of a rail road in a highway is, *per se*, a diversion of the way to a new and exclusive use. Whether it is so or not, depends upon matter of *fact*. A consideration of these incontrovertible positions will readily account for, and reconcile with principle, most, if not all, of the conflicting decisions and dicta to be found in the books touching the character of rail roads. Some of the anti rail road cases, as they may be called, deserve a passing notice. Judge Gridley, in *Benedict* v. *Goit*, (3 *Barb.* 465,) whilst favoring the new device of a plank road, which many people abominate, says, "A rail road is, in no sense, a public highway. The nature of the road forbids its use by the public in common with the company." For this *obiter dictum*, he vouches three New York cases. If they countenance it, they are borne down by a great weight of authority. *The Seneca Road Co.* v. *Aub. and Roch. R. R. Co.* (5 *Hill*, 170,) is the first. There it was held that a rail road company could not use a turnpike without making compensation to the turnpike company. But the decision is not relevant to the point under discussion. A turnpike road is not a common highway. It is "the company's own, and no person without their consent can lawfully use, incumber, or otherwise interfere with it in any way, except as travelers, on the terms fixed by the act of incorporation." The decision that a rail road company could not take and use such a road *without compensation* was a necessary result of these facts. The next case cited by Judge Gridley, is *Fletcher* v. *The Auburn and Syracuse R. R. Co.*

(25 *Wend.* 462,) where a rail road company was held liable for injury to adjacent lands resulting from the lawful use of its road. The case deserves little notice in this connection. The court treated the act of the company in using the road as lawful and regular, and yet held that "consequential injury to *adjacent* owners" gave them a right of action. It is not said by the court nor alleged in the declaration that the plaintiff had any interest in *the road*, or any right to have it kept at any particular grade for the benefit of his "*adjacent*" land, or that the company was guilty of any neglect or misconduct of any kind. But the case was decided on *demurrer*, and the declaration may have contained allegations overlooked by the reporter, and deemed by the court to show a *title* which the company, by raising the embankment, had invaded. The opinion of the court of appeals, delivered by Bronson, J., in *Radcliff's Ex'rs* v. *Mayor*, (4 *Comst.* 205,) shows that this case, as it stands in the report, is not law. Judge Gridley may seem to be supported by *The First Bap. Ch. in Schenectady* v. *The Schenectady and Troy R. R. Co.* (5 *Barb.* 85 ; *see Reporter's note*, 6 *id.* 319.) This was an action against a rail road company for disturbing a congregation at divine worship on Sunday, by the noise of their cars, engines, whistles, bells, &c. The court says : "The defendants, in creating that disturbance, were engaged in *unlawful* business. The acts of which the plaintiffs complain were clearly within the prohibition of the statute relating to the observance of the Christian sabbath. The plaintiff sustained a pecuniary injury as the result of these unlawful acts of the defendants. In these facts I find all the elements necessary to maintain the action." The ground on which the court went shows the decision to be wholly irrelevant to the general question. One of Judge Gridley's citations, that is to say, *The Trustees of the Presbyterian Society in Waterloo* v. *The Auburn and Rochester Rail Rail Company*, (3 *Hill*, 568,) is a point blank decision that the use of a road by a rail road company's cars is a *private* user. The position is wholly irreconcileable with the celebrated resolution of the court of errors in 18 *Wend.* 77. No notice was taken of the leading

case in 8 *Dana,* 308, decided and published but three years previously, and the only authority cited by the court is its own recent decision, (25 *Wend.* 462,) not then or yet overthrown by the opinion in 4 *Comst.* 205. We do not add to this list of anti rail road decisions the Broadway case of *Milhau* v. *Sharp,* (17 *Barb.* 438,) decided by Mr. Justice Harris at special term ; for he expressly decided that a rail road in a city street is not a public nuisance. (*Id.* 444.) And he virtually admits that its establishment would invade no absolute right of the adjacent lot owners, since he puts their whole title to relief upon the fact that the undertaking was illegal, viz. the result of an illegal relinquishment by the corporation of its power over the street. (*Id.* 439.) Any inferences unfavorable to the general proposition above asserted, which might possibly be drawn from the *dicta* and decisions above reviewed, are completely countervailed by an overwhelming weight of authority.

From the line of judicial decisions to which we shall next refer, we claim the following propositions, to wit :

1. A rail road in the public streets of a city or village is not, *per se,* a public nuisance, or an invasion of any private right vested in the lot owners fronting on such streets.

2. Even where a street is not the property of the state or of the municipality granting the privilege to use it as a rail road, and the fee thereof continues in the individual who dedicated or devoted it as a public highway, the use thereof for rails and rail cars, with the assent of the local body having by law the regulation of highways, is consistent with the dedication, and neither a public nor a private wrong.

3. Municipal corporations without any known exception until the act of April 4, 1854, have had power to authorize this kind of use of the public streets. Acts of the legislature requiring their assent in particular cases are rather to be regarded as recognitions of a pre-existing right and manifestations of a scrupulous regard thereto on the part of the legislature, than as grants of a licensing power. (15 *Barb.* 207.) The decisions in support of these three points are so numerous and so controling, that we will refer to them only in a very brief way.

*The Lexington and Ohio R. R. Co.* v. *Applegate,* (8 *Dana,* 290,) first raised the question how far a city corporation could authorize a rail road company to use the public streets. It contains a full investigation of the question, on the general principles of the common law. The streets of Louisville, Ky. were of such a nature and origin, that the lot owners fronting thereon had in the same " a private right in the nature of an incorporeal hereditament legally attached to their contiguous ground," (*p.* 294,) and there was " no constitutional authority for discontinuing any one of the streets, without making just compensation" to such lot owners for the damage resulting therefrom to their property. (*P.* 295.) The rail road company was incorporated without any special authority to use streets or highways, or any reference to a municipal assent; it was left to acquire the right of way by *ad quod damnum* in the usual manner. (*P.* 290.) With the concurrence of the corporation of Louisville, it located its road through one of the streets of that city, and ran *steam carriages* over the same. On a bill filed by numerous lot owners, the court of appeals, in an able opinion, affirmed the whole of the doctrine claimed in the three points last above stated. (*See pp.* 298, 302, 304, 305, 309.) This was in 1839. In 1841 Chancellor Walworth decided the case of *Hamilton* v. *The New York and Harlem R. R. Co.* (9 *Paige,* 171.) True, he went into no reasoning on the general question, but this only shows how clear of doubt that eminent jurist considered it. True it is, the charter of that company required, and of course authorized, the assent of the common council; (*Laws of* 1831, *p.* 328, § 16 ;) but the learned chancellor did not regard that circumstance as sufficiently important even to refer to it. The question was again reviewed upon principle at the New York general term in 1849, before Ex-Chancellor Samuel Jones as presiding justice, who exhausts the whole subject in a lengthy and elaborate judgment. (*Drake* v. *Hudson R. R. Co.* 7 *Barb.* 524. *See pp.* 538, 545–548.) His associates concurred with him ; one of them, Edwards, J., delivered a well considered opinion. (*Id.* 556.) A general term of this court, held in 1848, before three very eminent judges, Cady, Willard

and Hand, Js., held unhesitatingly that a rail road established in one of the public streets of a city was not objectionable. (*First Bap. Ch. &c.* v. *The Utica and Sch. R. R. Co.* 6 *Barb.* 316.) See also Judge Strong's opinion to the same effect in *Hentz* v. *Long Island R. R. Co.* (13 *id.* 656.) The whole doctrine of the leading case in 8 *Dana,* above cited, was reviewed, approved and applied throughout to a street in Albany, at a general term held in 1851, Harris, J. delivering the opinion of the court. (*Chapman* v. *Albany and Sch. R. R. Co.* 10 *Barb.* 365.) In *Adams* v. *The Saratoga & Wash. R. R. Co.* (11 *id.* 450,) Willard, J., delivering the opinion of a general term, says : "To allow a street in a city or village to be used for a rail road track, either upon its natural surface, or by tunneling, is not a misappropriation of it, provided such use does not interfere with the free and unobstructed use of it by the public as a highway for passage and repassage." That was a tunneling case. The learned judge treats the temporary interruption during the progress of the work as trivial and unimportant. He says : " It was not shown that the street will be destroyed or materially injured by the rail road and tunnel, after they shall have been completed. It is a matter of notoriety that rail roads ·pass through all our great cities and many of our villages, without essential injury to the right of passage by teams or persons. Individuals residing on the street must sustain a temporary inconvenience during the progress of the work; but for this, in the absence of negligence or unskillfulness, the defendants are not responsible." This brings us down to the dispute between the common council and the superior court of this city, during what Judge Morris, in 16 *Barb.* 411, aptly calls the "*the injunction epidemic.*" Even the cases decided during that period all affirm the three positions above stated. (*Milhau* v. *Sharp,* 15 *Barb. per Edwards, P. J.* 208, 210, 211. *Per Strong, J.* 221, 222. *Per Morris, J.* 232.) There is nothing in Judge Harris' special term decision on the trial of this same case, (*Milhau* v. *Sharp,* 17 *id.* 437,) conflicting·with these doctrines. He put his decision against the road on the ground of a special defect which he imagined to exist in the grant, viz. that

Wetmore *v.* Story.

being irrevocable for a term of years, it amounted to an unlawful surrender or transfer by the municipal body of its corporate trust and duty to regulate the streets. (*Id.* 439, 441.) *Milhau* v. *Sharp*, (15 *Barb.* and 17 *id.* 437,) is the Broadway rail road case in this court; the history of its mate in the superior court will be found in 1 *Duer*, 451, in the printed case on the appeal of the aldermen to the court of appeals against the commitment for contempt, and in *Davis* v. *The Mayor*, (2 *Duer*, 664.) See *same case*, (11 *N. Y. Legal Obs.* 359,) and *Att'y Gen. ex rel. Davis et al.* v. *The Mayor &c.* (12 *id.* 17.) On the trial Judge Duer decided, 1st. that the rail road was not a public nuisance ; and 2dly, that it was not satisfactorily proven to be an unlawful injury to any private interest of the plaintiffs. (12 *N. Y. Legal Obs.* 17.) Therefore, it will be seen that even in the angry excitement of that day and case, the sound doctrines of 8 *Dana* passed through the fire unscathed. We next come to a case beyond the region of that excitement : *Williams* v. *The N. Y. Central R. R. Co.* (18 *Barb.* 223,) which was decided by a general term in 1854. It was in principle precisely a parallel case with that in 8 *Dana*, and the decision is to the same effect. It is perhaps the more emphatic from the circumstance that the street in question, over which the rail road ran, was owned in fee by the plaintiff and others, and had been by them voluntarily and gratuitously dedicated for a public street or highway. (18 *Barb.* 223, 233, 244, 5.) See also the reasonings of Judge Willard in 11 *id.* 454. We have referred to the case in 8 *Dana* as the leading authority on this subject. We have done so because it was the first case of the sort in this country ; because the *rationale* of the matter is so fully gone into ; because the complainants had a private right or interest in the street ; and because the case is free from any circumstance on which ingenious casuistry could found a distinction to disparage it as the authoritative enunciation of a general common law principle. The case of the Harlem rail road in New York, (9 *Paige*, 171,) has been sometimes impugned, because the legislature had expressly sanctioned an application to the municipal body for its assent. (*Laws of* 1831, *p.* 328,

§ 16.) Like observations, on the same ground, have been made in reference to the Hudson River rail road case, (7 *Barb.* 536; *Laws of* 1846, *p.* 274, § 4,) and perhaps as much might be said in respect to one or more of the other cases in this state. But the case in 8 *Dana* is free from this feature, and so is the case in 18 *Barb.*, with which we close this review.

These very New York statutes expressly authorizing rail roads in cities are legislative declarations of the law. They prove that such rail roads are not nuisances; for " that which is authorized by an act of the legislature cannot be a nuisance." (*Per Hand, J. 6 Barb.* 318.) They also recognize the prin-- ciple that the control and regulation of streets, of right belongs to the municipal government. And it makes nothing against this position that the violence of the rail road war in New York, and " the injunction epidemic" on the bench, forced the legislature to terminate both by that very strong *peace measure*, the act of April 4th, 1854. (*Laws of* 1854, *p.* 323.)

We next insist that the making of the grant in question was an act within the legal competency of the common council. The plaintiffs assert that the common council has only the " *legislative power*" of the corporation, and so far they are undoubtedly correct. They assert that the resolution in question constitutes both a contract and a grant; that all contracts and grants are executive acts, and consequently that a capacity to make them does not vest in a legal entity, which, by the law of its creation, possesses no other than the legislative power. It is not necessary to deny that the resolutions, when accepted, would constitute a grant and a contract, without further formality. Chief Justice Marshall, in *Fletcher* v. *Peck*, (6 *Cranch*, 137,) held that an act of the legislature of Georgia, passed in 1795, *granting* lands to an individual, was a *contract* executed. Chief Justice Marshall, delivering the opinion of the court, treats it as an undeniable proposition that this act was within the legislative power, *unless expressly restrained.* At p. 128, he says: " The only question presented by this demurrer for the consideration of the court is, did the then constitution of the state of Georgia prohibit the legislature to dispose of the lands which were the sub-

ject of this contract, *in the manner* stipulated by the contract. In the constitution of Georgia, adopted in the year 1789, the court can perceive no *restriction* on the *legislative power* which inhibits the passage of the act of 1795.   The court cannot say that in passing that act the legislature has transcended its powers and violated the constitution." (*See Kendall's case,* 12 *Peters,* 610.)   A theoretical reader might think that an act of this kind was not within the "*legislative" power*.   Indeed, just such a philological puzzle on the import of the word "judicial" divided our court of errors in *People* v. *Mayor,* (25 *Wend.* 63, 64,) and considerably embarrassed another high court, (21 *Maine R.* 555.)   But both courts escaped from error, and affirmed the sound doctrine that we must construe phrases as they are used in the practical concerns of life.   It is a fundamental maxim of all free governments, that the three great departments should be kept separate.   In many of the state constitutions this dogma is elaborately enunciated in a formal declaration of principles. In the constitution of the United States, and we believe in that of every state in the union, the executive and legislative powers are vested separately, the one in a chief magistrate, and the other in a representative body of delegates.   Yet at least one-half of the laws of every session of congress and of the state legislatures is devoted to acts operating on particular subjects and in favor of particular persons, in such a way as to constitute, in the theoretical sense before alluded to, an executive act.   Acts of incorporation, grants of land, money, &c. and directions for particular works, and an infinite variety of like things, might be instanced to verify these remarks.

It is objected that the common council proceeded irregularly in the adoption of these resolutions.   The aldermen hold for two years; the members of the second house in the municipal legislature hold for one year only.   This resolution was adopted by the aldermen in 1852, amended and returned to that body by the assistants of that year; and early in January, 1853, after the assistants of 1852 had gone out of office, the aldermen concurred in the amendment, and sent the resolution to the mayor for his approval.   He vetoed the measure in January, 1853;

and in November of that year, both boards reconsidered and adopted the resolution notwithstanding the veto.   The resolution required the work to be commenced on the first day of "May next."   Consequently the resolution, as ultimately adopted, refers to May, 1854 ; whereas, as they read, *in fact*, when vetoed, they referred to May, 1853.   On these facts, a double irregularity is alleged ; first, it is said that on the termination of the assistants' year, all business on which they had acted, and which had not received the assent of the aldermen, fell through or became discontinued ; and, consequently, that all corporate measures partially matured require to their legality a new commencement in January of each year.   Secondly, it is said that the measure vetoed, and that sanctioned by the resolve as ultimately adopted, were not in any legal sense the same, because of the peculiar effect of the words "*May next,*" just stated. The first of these objections is founded upon a supposition that the *practice* of the British parliament and of our legislatures in conducting business, adopted for their own convenience, constitute a *rule of law* binding on them ; and that there is an analogy between those bodies and the common council of New York which makes such practice a controlling guide to the latter. We deny that those practices are *law* to the bodies which established them.   Like other rules, they may be departed from. We also deny the analogy.   The municipal legislature is inferior and subordinate ; its duties lie within, comparatively, a very narrow compass.   Its members do not come together from remote and distant points, represent interests materially diverse and conflicting, or bring with them different capacities for action arising from circumstances connected with far separated constituencies.   In all these respects the common council differs from parliament, congress, and the state legislature.   The courts have sanctioned the idea that whatever changes take place in their members, these domestic forums are continuous.   In *Coles* v. *The Trustees of Williamsburgh*, (10 *Wend.* 659,) the point was so ruled.   A statute required, as an indispensable preliminary to the opening of a street by the village council, that a petition, of a prescribed kind, should be presented to them.

Wetmore *v.* Story.

Such a petition was presented and acted on, but ineffectually. A new board took it up and adopted the measure. The court says, at page 665, " The petition *presented to their predecessors* was sufficient authority for them to direct the street to be opened." The separation of the New York corporate body, by forming executive and legislative branches, and by dividing the latter into two chambers, originated in the amended charter of 1830. (*Laws of* 1830, *p.* 125.) This technical question was first raised after the lapse of twenty years. The law committee of the board of aldermen, to whom it was referred, took the opinion of Mr. George Wood, and reported it to the board with their own in conformity. They deemed the boards continuous, and not altered or varied in any respect by alterations in their members. They say that this doctrine " has been practiced since 1831, and is an established custom of the two boards." .(*See Document No.* 29, *of the Board of Aldermen for* 1854.) The question had been already examined with a like result by the counsel of the corporation. (*See Proceedings of the Board of Assistants, vol.* 38, *p.* 126; *Supervisors of Chenango* v. *Birdsall,* 4 *Wend.* 453, 460.) After twenty-five years acquiescence and numerous rights probably acquired in good faith on this construction, it would not be very judicious to disturb it. (25 *Wend.* 11, 12.) But let us see how far the analogy contended for exists. The parliament of Great Britain was not originally a continuous body in point of fact. On the contrary, each parliament was convened by the crown, not only by special summons, but for a special occasion, as an advisory body. Its constitution was consequently regarded as being special, and its authority as being limited to the special purpose of the call. This appears from the ancient doctrine that the signing of a single act by the king worked *ipso facto* a dissolution of parliament. The negative of this was not established until as late as A. D. 1620. (2 *Hatsell's Precedents,* 328, 3d ed. 4 *Inst.* 28. 5 *Comyn's Dig. Par.* Q. 312. *See act of* 16 *Car.* 1, *ch.* 4. 4 *Stat. at L.* 131.) Parliament was regarded by the king, and, of course, by the judges of his appointment, not as an established institution, but as an occasional resort. Continuity did not

belong to it.   It was "a parliament," and not "the parliament,"
that was formed on each royal summons.   Popular liberty has
in this, as in most matters of substance, at length triumphed
over prerogative.   Annual sessions are now the settled usage ;
and, as the expression is, " annual parliaments" have become a
part of the constitution of England ;  yet the original *intendment*
prevails in all the practical forms.   Each *session* is still treated
as a distinct parliament ; it is convened by the king's special
summons, and cannot assemble otherwise.   (*Dwarris on Stat.*
*p*. 69, 70.)   As a consequence, all legislative business not com-
pleted at the close of a session is absolutely discontinued and
falls to the ground.   (*Dwarris on Stat.* 257.   4 *Inst.* 27.)   The
upper house is a permanent body, and the commons are elected
octennially.   Consequently, there is no longer reason or pro-
priety in the common phrase "annual parliaments," or in the
notion that business must be discontinued by the mere close of
a session.   They both arise from that subserviency to estab-
lished forms so common in England.   Our congress has repu-
diated both.   The 19th rule of the house provides, that all bu-
siness left unfinished at the close of the first session may be re-
sumed and carried forward at the second.   (*Jefferson's Man.*
138.)   It appears that a parliament itself has treated the doc-
trine of discontinuance as a convenient fiction, for it is disre-
garded whenever public convenience requires.   The final appeal
at law and in equity is not to the lords merely, but to the lords
" in parliament."   It was at first conceived that all appeals and
writs of error were discontinued at the close of a parliament.
(*Haydon* v. *Gadsalve, Cro. Jac.* 342.   *Dethick* v. *Bradbourne,*
*Sir T. Raym. R.* 5.   *Crouch* v. *Haynes, Sir Wm. Jones' R.*
66.)   But the lords, feeling the inconvenience of the rule in
this case, determined that appeals and writs of error should not
abate by a prorogation or dissolution.   (*Gofton* v. *Sedgwick,*
2 *Levins,* 93.   *Prichard's case,* 1 *id.* 165.   5 *Com. Dig.*
*Par. P.* 2, *p.* 311.)   The ductility of this mere rule of business
is still more strongly manifested in the denial of its applicability
to a case of impeachment.   The commons are the prosecutors in
such cases.   Even after conviction, judgment cannot be pro-

nounced except upon their motion at the bar of the lords. (*Dwarris on Stat.* 254.) In this form of proceeding they virtually possess the pardoning power, like the prosecutor in the ancient appeal of death. (1 *B. & Ald.* 457.) Yet it is settled law, that a subsequent house of commons may proceed upon a pending impeachment commenced by a previous house. (1 *Dwarris on Stat.* 253. *Earl of Salisbury's case, Carthew,* 132.) So much for the idea of a parliamentary law of England, deducible from the practical rules for the despatch of business, adopted in that country, which, by analogy, should control the action of our city council, under its positive written charter. An answer even more decisive, may be given to the attempt to establish a similar analogy in this respect between our own parliamentary constitutions and the city charter. Neither the constitution of the United States, nor that of this state, nor any of the amended charters of New York, contains any provision bearing directly upon the mode in which, as a general rule, one house shall act upon the resolves of the other. Light upon that point can only be gathered from the provisions concerning the executive assent. The constitution of U. S. art. 1, § 7, sub. 2, provides, that "If any bill shall not be returned by the president within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law, in like manner as if he had signed it, unless the congress by their adjournment prevent its return, in which case it shall not become a law." The *Const. of N. Y. of* 1821, *art.* 1, § 12, and the *Const. of N. Y. of* 1846, *art.* 4, § 9, use precisely the same language. The *Const. of N. Y. of* 1777, *art.* 3, gave the veto, not to the governor, but to a council of revision, and no aid can be gathered from its provisions. The amended charter of New York, of 1830, (*Davies' Laws,* 201,) contains the following provisions on this subject :

§ 12. Every act, &c. which shall have passed the two boards of the common council, before it shall take effect, shall be presented, duly certified, to the mayor of the city, for his approbation. If he approve, he shall sign it; if not, he *shall* return it, with his objections, to the board in which it originated, *with-*

*in ten days thereafter ;* or, if such board be not then in session, *at its next stated meeting.* The board to which it shall be returned, *shall* enter the objections at large on the journal, and cause the same to be published in one or more of the public newspapers in the city.

§ 13. Such board " *shall, after* the expiration of *not less* than *ten* days thereafter, proceed to reconsider the same. If, after such reconsideration, a majority of the members elected to the board shall agree to pass the same, it *shall* be sent, together with the objections, to the other board, by which it shall be likewise reconsidered, and if approved by a majority of all the members elected to such board, it *shall* take effect."

§ 14. If the mayor shall not return any act, or ordinance, or resolution, so presented to him within the time above limited for that purpose, it *shall* take effect, in the same manner as if he had signed it.

The only thing in this act throwing light upon the meaning of the above reference to stated meetings, is as follows :
§ 9. " The stated and occasional meetings of each board shall be regulated by *its own* ordinances ; and both boards may meet on the same or on different days, as they may severally judge expedient." The amended charter of 1849 (*Davies' Laws, p.* 205) made the following alteration :

§ 6. "If any ordinance or resolution passed by each board, as provided by sections 12 and 13 of the amended charter of 1830, shall not be returned by the mayor within ten days (Sundays excepted) after it shall have been presented to him, the same shall become a law, in like manner as if he had signed it, unless the close of the session of the common council shall prevent its return, in which case it shall not be a law until the expiration of five days after the commencement of *the next session* of the common council, by whom the ordinance or resolution *shall* be reconsidered, if returned within such time, *and be disposed of in the same manner and with the like effect as if presented at the preceding session.*"

There is no alteration in this branch of the law by the amended charter of 1853, except that section 5 requires a two-

third vote to overcome the veto. Section 3 of the charter of 1849 provided that "the common council shall annually hold only three stated sessions, of not exceeding one month each, commencing on the first Monday of January, May and September." (*Laws of* 1849, *p.* 278.) But by act of 1851, this section was so modified as to read, that " The common council shall hold their sessions monthly, commencing on the first Monday of each month; but at no such session shall the members be entitled to draw any per diem allowance for a longer period than eight days." (*Laws of* 1851, *p.* 1001, § 1.) The amended charter of 1853 did not supersede the old board of assistants and let into its place the board of councilmen until January 1, 1854. (*See Davies' Laws, p.* 211, §§ 2, 3.) It will be seen that by the constitution of the United States, and of the state of New York, the mode in which the houses should commune (so far at least as this question is concerned) was left to their own discretion. A long interval between the sessions must have been contemplated. It was not to be supposed that, in bodies so constituted, old unfinished business would be resumed after an election of new members to the lower house, and of a large part or the whole of the other. The discontinuance of a pending measure is only provided for in one case, viz. the non-approval of a bill by the executive. Both constitutions provide that an *adjournment* of congress, by which a return within ten days is prevented, shall work an absolute discontinuance. In that case the bill " *shall not become a law.*" The charter of 1830 was adopted in a convention elected by the people, containing some of our most learned and eminent jurists. (*See the Report of its proceedings at large in Kent's N. Y. Charter,* 1*st ed.*) No one can read this charter without perceiving that it was modelled upon our written constitutions. The intent may therefore be gathered as well by observing what they expunged as by perusing what they retained. (12 *Wend.* 318.) It may fairly be supposed that they deemed the former unsuitable. They expressly and *affirmatively* repudiated the idea that the close of a session shall work a discontinuance. The mayor is required to return

the bill to the *next session*. This idea is carried forward and enforced in the subsequent amendments ; and besides, it is a matter of history, that our charter has been renewed and amended under a high pressure of party clamor against the corporation, twice since the very question we are now discussing arose in the common council, and was determined adversely to the doctrine of discontinuance. It arose in 1850 ; the very part of the charter of 1849 most nearly connected with the subject was amended in 1851, and we obtained a new amended charter in 1853. It seems that the people and the legislature approved the principle of unbroken continuity. (2 *Kern.* 231.) So much for any reasoning from analogy to our own constitutions. The comparison affords a conclusive argument against the notion of a discontinuance. If we refer to the detailed provisions of the charter as to the course upon a vetoed ordinance, they are found most positive and peremptory in their directions ; they push forward the measure through all the successive steps of legislation, without admitting of any exceptional case. The mayor *shall* return it, the board receiving *shall* reconsider it, and *shall* send it to the other board, by whom it *shall* be likewise reconsidered. If approved on such reconsideration, "it *shall* take effect." The mayor is peremptorily enjoined to send it to the *next* session, though it be in the next year; the body receiving it, after reconsideration, though it be on the last day of the year, are peremptorily enjoined to send it to. the other, though the members be all new, and the latter is commanded to reconsider. The language throughout is the most imperative that could be employed. To fritter away these positive injunctions of law by implied exceptions, founded upon farfetched and inapplicable analogies, would not be giving law, but trifling with the clearly expressed will of the supreme law making power. If, as suggested, a board should commit such an abuse as to pick up among the dust and rubbish of by-gone days an antiquated and forgotten measure which had been long previously sent to it for concurrence and approve it, the mayor's veto would correct the mischief. After that the assent of the

first board would again become necessary. Besides, this is an extravagant supposition. The reasonable construction of a law is to be judged of from what would naturally be the usual and legitimate course of action under it. A particular construction is not to be rejected because a fertile imagination can eviscerate from supposable morbid action, a possible inconvenience. It is the duty of each board, as soon as it conveniently may, to act upon and dispose of each measure sent to it by the other for concurrence. A violation of this duty is not to be presumed, and nothing is less likely than a violation to the extent suggested. The very captious objection founded on the words "May next," is easily answered. A legislative act takes effect from the time it receives its final sanction. It speaks from the date of the executive approval, or the approving vote on reconsideration by congress, the legislature or the common council, after a veto. This is the settled law of England and America. (2 *Hatsell's Precedents*, 330, 331, *notes, 3d ed. Opinions of Att'ys Gen. p.* 1055.) Of course, in its original form, the resolution in question referred to the first day of May next after it should become an operative ordinance. It always meant, and still means, the same thing ; the words at all times in legal intendment, pointed to the same result and to the same day. This position is too plain for argument.

The objection that this grant comes within § 23 of the charter of 1849, (*Davies' Laws, p.* 209,) scarcely deserves notice. The section provides that all contracts "*for work to be done and supplies to be furnished*," shall be made by the appropriate heads of department. Judge Harris, in *Milhau* v. *Sharp*, (17 *Barb.* 443,) answers this objection. He says : "Nor do I think the resolution a violation of the provisions in the charter which requires that contracts for work to be .done, shall be made by the appropriate heads of an executive department. This pro-, vision, as I understand it, only relates to contracts which would involve a liability to pay for the work to be done. An agreement, as in this case, to sweep and cleanse a street, not for a compensation to be paid, but as the condition on which the privileges specified in the contract are granted, may, as it seems to

me, very well be made by the common council itself, without the intervention of any of the heads of department." It would be a singularly inconvenient constructive expansion of this section 23, to hold that it restrained the common council from any and every act and measure which might involve any return or recompense to the public in the form of *service* or labor. *Christopher's case*, (13 *Barb.* 568, 569,) was an action to vacate a contract by the common council for work and materials in rebuilding Washington market, to be paid for by the city. The *De Baun case*, (16 *Barb.* 392,) was brought to vacate a like contract for work and materials in paving a street. Both cases went upon the construction of the 23d section. (16 *Barb.* 400.) They have nothing to do with the present argument, save so far as they may be supposed to uphold the hitherto " unheard of" doctrine—as Judge Roosevelt admits it to be—that a tax payer, as such, may file a bill in equity against any public officer or body for a breach of duty or usurpation of power. (*Id.* 401.)

We proceed to a somewhat analogous objection. It is said that the license to form this rail road track, and use it, was *"property"* and *"a franchise,"* and should, therefore, have been put up at auction and disposed of to the highest bidder, pursuant to section 7 of the amended charter of 1853. Submitting, against any extremely latitudinarian construction of this provision, the remarks of Mr. Grundy, in *Att'y Gen. Opinions, p.* 1254, we claim that this license is neither a *franchise* nor *property*. At a future stage of our argument, we hope to show that it *vested* no interest whatever, being a mere revocable license or permission. If we succeed in establishing that position, it will be conclusive that this section does not apply to this case. The section reads as follows: "All ferries, docks, piers and slips shall be leased, and all leases and sales of public property and franchises," (other than water grants,) " shall be made by public auction and to the highest bidder who will give adequate security." "All persons acquiring any ferry lease or franchise under the provisions of this act, shall be required to purchase at a fair appraised valuation,

the boats, buildings and other property of the former lessees, actually necessary for the purposes of such ferry." (*Davies' Laws*, 211.)   In considering the application of this statute, it becomes important to ascertain what is intended by the word franchises, as here used.   *Ferries* are franchises, as that word is commonly used and understood, although properly it is the *toll*, or, still more precisely speaking, the right to take it, which constitutes the franchise. (2 *Black. Com.* 38.   3 *Kent's Com.* 459.   11 *Peters*, 639.   1 *Burrill's Law Dict. Franchise*, 515. 2 *id. Toll*, 988.   7 *Comyn's Dig.* 458, *title Toll, C. F. E. Heddy* v. *Wheelhouse, Cro. Eliz.* 558.)   The corporation of the city of New York, by *Montgomerie's Charter*, § 15, (*Davies' Laws relative to the city, p.* 117,) has authority to "set up" and "establish" *ferries*, and to let and sell the same; but it has no power to create any other franchise.   True, it may grant license to keep a tavern, (*Dongan's Charter*, § 10; *Montgomerie's Charter*, § 25,) and this being in some sense a *monopoly*, might be called a *franchise;* but so might the privilege to keep a stall in the public market, to be a public cartman, porter, or hackdriver; but these things have never been called or deemed franchises.   They differ substantially from franchises in several respects.   These persons are not *bound* by force of their licenses to prosecute the business and maintain suitable accommodations.   They can, at any moment, abandon their occupations.   (2 *Hilliard's Abr.* § 2, *ch.* 8, *div.* 7.)   Persons pursuing these employments are not commonly entitled by law to demand and receive any particular *toll* or *profit* for their wares or services; and herein is the very essence of a *saleable franchise*.   They must make their own bargains, or sue on the *quantum meruit ;* nor does this latter consideration lose much of its force from the fact that innkeepers are sometimes compelled to accommodate travelers, and not allowed to charge above certain rates.   The privilege to have a fair or market, unaccompanied by any toll or other profit, could hardly be called a franchise. (*Cro. Eliz.* 558.)   If it could, the idea of selling it at auction to the highest bidder would hardly find place in a sane mind.   The power to hold markets is given to the corpo-

ration, but not to grant or lease to others the right of holding them. (*Montgomeries' Ch.* § 17.) This and many other *franchises* are held and possessed by the corporation; but ferries are the only franchises that it can either create or *grant* to others. The various detailed provisions of this section (*Am. Ch. of* 1853, § 7) show that the legislature used the word franchises in reference to *ferries* only, and the circumstance that the corporation had no power to create or let or sell *any other franchise,* conclusively so limits it. The license to lay down rails is not a franchise; it is a mere burthen. These rails, when laid down, are not to be in the exclusive occupancy of the grantees. Any one else who has a suitable carriage may ride on them or over them. Cartmen actually do so, to a great extent, preferring them to the other part of the street. It may happen, as a matter of fact, that others will not have suitable carriages; it may happen that the mayor will not license other hackmen to use such carriages as could run upon them; and it must be admitted that no private gentleman could make a carriage for his own or his family's use, and run over them, except out of a spiteful and malicious desire to intrude, which would be actionable on common law principles. (17 *John.* 98.) But all this does not prove that the licensees have a *franchise* within even the general signification of the term. These are mere incidental circumstances. When there was but one licensed innkeeper or hackman in the city, neither of them possessed franchises, even though there was employment for no more, and it would, consequently, have been a violation of official duty in the authorities to license another. Probably this purely elementary discussion ought not to be pursued. The question is not what may amount to a franchise, but what is a franchise, "within the meaning of this act." (19 *Wend.* 12, 13, *and cases cited.*) Words used by the legislature are to be taken according to their signification in general use. (2 *Zabriskie's N. J. R.* 368, 369. 2 *Kernan,* 198, 199.) If we should concede that any proper definition of a *franchise,* which can be framed, would embrace a licensed porter, cartman, hackman, or butcher, (11 *Peters,* 639; 15 *John.* 379,) the question would still remain,

Wetmore *v.* Story.

are such things franchises within the meaning of this act? In every elementary work in which franchises are enumerated or classified—and such books abound—an answer will be found in the negative. Rail road companies are generally incorporated. Corporate existence is a *franchise.* They commonly exercise the eminent domain in taking lands for the use of the road. This is a franchise. They may be authorized to take a specified " *toll.*" This is a *franchise.* But a private joint-stock unincorporated company, which assumes the burden of paving part of the street, or to fit it for use by their carriages, and is then licensed to run its carriages over the same, does not thereby acquire a *franchise,* in any sense in which the term was ever used; much less within the sense of the words in a special act imposing restraints upon a corporate body, which cannot create or sell any other franchise but a ferry. The idea that this grant was *property* in the sense of this section, requires but little notice. The privilege of paving the public street certainly was not public property granted to the defendants. An owner who agrees with a builder for the erection of a house upon his land, confers no property or title upon the latter. What then is granted? Certainly not a toll from passengers; for the defendants are not authorized to receive any thing; they have merely stipulated *not* to charge *more* than five cents. And if they were, there is no right to such toll vested as *property,* in the corporation. These defendants are allowed to run their cars, provided the mayor will license them. Is this property? If it is, every cartman takes a portion of the public property when he receives his annual license. We will notice, in connection with this notion of the license being *property,* two other objections. 2 *R. L. of* 1813, *p.* 424, § 198, enacts, "that in all cases of persons meeting each other in any street or road of the city, in carriages, wagons, carts or sleighs, each person shall go to that side of the street or road on his right." It has been said that "every person meeting a rail car going in the opposite direction must move wholly out of the way of the car, and the car is not obliged to be turned out of the direction marked by its track." And hence it was argued and

decided in the superior court that here was the grant of a
franchise, viz. of the privilege of not turning out as others
would have to do.   Here again a mere accidental circumstance,
which might or might not ever happen, is made to enter alto-
gether too deeply into the legal nature and constitution of this
grant.   There are many answers to all this.   First *non constat*,
that such a meeting would ever take place.   If it did, the com-
mon carriage owner, unless drunk or crazy, would .be acting
willfully and maliciously.   (5 *Barb.* 338, 339.)   Such conduct
was not anticipated by the common council, nor did they in-
tend to give, nor did the defendants contemplate receiving, an
exemption from the five dollar penalty imposed by this statute,
if indeed perchance circumstances should ever arise entitling
any one to recover it.   Nothing of the kind is expressed: it
cannot reasonably be implied.   Besides, it was quite within the
competency of the common council to regulate the use of the
streets so that these rail cars and carriages should not meet, and
thus prevent the arising of a case to which this statute could apply.
*Montgomerie's Charter*, § 14, authorizes the common council,
by ordinance, from time to time, to declare " how and after what
manner and order," " all artificers, inhabitants and residents of
the said city, and their factors, servants and apprentices, in
their business, shall use, carry and behave themselves."   By
section 16 it gives the common council like authority to appoint,
order and direct the *making* and laying out of all streets, lanes,
alleys and highways, in such manner as they " shall think or
judge to be necessary or convenient for all inhabitants or trav-
elers there."   In the exercise of this discretionary govern-
mental authority the corporation has formed side walks, and
from time to time extended or narrowed them as it saw fit.
The common right given by law to all equestrians and char-
ioteers to use the whole street was not invaded by this act.
What is to prevent the corporation from subdividing in a greater
degree the public streets, as improvements in the means of loco-
motion and transportation may suggest.   Suppose the center
of the street were assigned to one description of vehicles, and
that center subdivided so that those going in different direc-

tions should never meet, what would be the objection. Such is, in fact, the rail road system. ˙ Why might not all other vehicles be compelled to adopt a similar rule, all going south to keep to the west of the central portion, all going north to keep to the east of it. Under such a regulation of the public streets, this *section of the statute would* never come into play, and never could be violated. The common council are not to be pronounced offenders or usurpers of power, merely because they have pulled out the fangs of a penal statute by rendering infractions of it impossible. It may be said such regulations cannot be made. A little cool reflection will show that they are in substance made by the city rail road system. He who would run his carriage against the front of a rail car, which could not move from its position, would not involve the car owner in the penalty, and would be liable to a civil action for his willfulness and malice. The statute regulating travel on highways, &c. in the country afforded a better pretext for this very sharp little cavil. It ˙enacts that when persons traveling in carriages shall meet, they shall " seasonably turn their carriages to the right of the *center* of the road." (1 *R. S.* 695, § 1.) But the courts gave even to˙ these strict words a liberal and benign construction, which would forbid any one from running against a rail car. (*Smith* v. *Dygert*, 12 *Barb.* 615. *Jaquith* v. *Richardson*, 8 *Metc.* 216.) The New York city statute is better worded, and leaves the corporation fully at liberty to adopt the ancient method, or so much of it as may seem to be embraced in the rail road system.

Another objection is, that the grant in question is an attempt by the corporation to restrain the future exercise of its legislative powers over the streets—a delegation of its authority— a putting away or parting with the same. This is the precise ground of Judge Harris' special term decision, in *Milhau* v. *Sharp*, (17 *Barb.* 439.) He calls it the "fatal difficulty." "If it could be regarded as a mere revocable license," he says, " the case would be relieved from this fatal difficulty." Judge Strong, Judge Bosworth and Judge Duer, have all given their assent to this idea. It is rather oddly put. All concede that

the legislative power of the common council cannot be bartered away; and that it will remain, whatever they may do. No one contends that, expressly or in so many words, they professed to relinquish it, or that the relinquishment, if formally made, would be effectual, or would present any impediment to the future ex- ercise of their powers. No reason is given why it should be con- strued as an irrevocable grant, except the prejudice which would result to the grantees, if after they had finished the road the license should be arbitrarily revoked. It should be observed, however, that it would not be an *arbitrary* revocation if the public good required it; and the grantees being chargeable with knowledge of the law, must be presumed to have known that whenever the public good required it, the license would be revoked. They took the hazard of a change of policy in the municipal legisla- ture, and would have no right to complain, on the die turning up against them. True, the common council might judge un- wisely and revoke without good cause; but of this also the grantees were aware, and knowingly incurred the risk.

The limitation of a number of years expressed in the license amounted to nothing. " Unless the common council should see fit to change its policy," was a term implied. Licenses to inn- keepers, cartmen, porters, &c. are all expressed to be for a year, but they are all revocable at pleasure. (5 *Cowen,* 496.) The grantees of these rail roads take their licenses subject to revocation. The courts had only to say *valeat tantum valere potest,* it is well enough as long as the legislative will of the common council shall approve this manner of managing the pub- lic street. Some judges have thought, however, that because such a construction might mislead ignorant grantees, it must not be adopted. They say the licenses, as mere licenses, would be valid enough; they cannot operate as grants; but, neverthe- less, they are grants, and being grants in *fact* and not grants in *law,* they can't be any thing else; so they are not even licenses, but are utterly void. The conclusion of Judge Harris at spe- cial term, in *Milhau* v. *Sharp,* (17 *Barb.* 439,) is the opinion of a single judge, and not a conclusive authority. In the same case, when heard at general term in *this* district, (15 *Barb.*

219,) Edwards and Strong, Js. concurred in the decision, Morris, J. dissented. Judge Strong alone assented to this point of irrevocability. (*Id.* 228, 229.) Judge Edwards placed his opinion on a different ground. In this court, no judgment of a general term, nor any two concurring opinions in the same case, affirm this point of irrevocability. Two judges have expressed that opinion, to be sure; but Edwards and Morris, Js., who sat with Judge Strong, both withheld their assent to it. Prior to the new organization of the courts, the contrary doctrine was well settled, upon authority. Several years ago the corporation entered into a solemn covenant with Britton, Carnley and Townsend, employing them to clean the streets for two years at a specified price. Within one year the common council revoked the employment, and assigned the duty to others. The contractors brought their suit, and this court at a full term, (August, 1844,) held the arrangement to be revocable in the legislative discretion of the common council. The same doctrine had been repeatedly held before that time. (5 *Cowen,* 542. 7 *id.* 604. *Id.* 352.) It is submitted that the weight of authority in this court, and the reason of the thing, are against the plaintiffs on this point. Two judges of the superior court, in the Broadway case, have affirmed this point, and, in the form of a bill in equity, have exercised the jurisdiction to restrain usurpations of power by the municipal corporation of New York. In the first place, *equity* has no jurisdiction to vacate or annul corporate acts void upon their face; as these grants must be, if void at all, on this ground. (3 *My. & Cr.* 97. 9 *Paige,* 390. 26 *Wend.* 136.) In the next place, a proceeding at common law *in this court,* by action or information, in the nature of a quo warranto, is alone applicable to such a case. (*See the strong language of Chan. Kent in Att'y Gen.* v. *Utica Ins. Co.* 2 *John. Ch. R.* 390, 391; *S. C.,* 15 *John.* 378, 387–390.) The power to restrain excess of jurisdiction in corporate bodies, is peculiarly the province of this court; we submit that the superior court manifestly transcended its powers and jurisdiction in the case referred to, and that its opinion is not only without authority as persuasive evidence of the law, but absolutely *coram non judice* and void.

(*Brahe* v. *Pythagoras Ass'n, How. Pr. R.* 44, 45.) We will present one single other consideration on this point of irrevocability, and then dismiss it. The ground taken is, that a franchise or an usufructuary interest in Broadway is the subject of the grant; and it is claimed that this is *irrevocably* granted. Each of these interests is what is termed in the law an incorporeal hereditament. (2 *Black. Com.* 21. 3 *Kent*, 403.) Judge Cowen says, in *Baker* v. *Braman*, that such an interest "cannot pass, even at common law, without a *deed.*" (6 *Hill*, 48. *Shep. Touch. by Preston & Hillard*, 229, *note* 4.) As these interests cannot vest without deed, a parol grant of them can only enure as a license or consent, which, of course, is revocable at the will of the grantor. The grant in question does not in any way interfere with the power of the mayor to license carriages. It authorizes them to run their carriages, subject to various provisions, each enjoining some duty on the grantees. One of these is, "Provided that the said cars shall be licensed by the mayor." It says to them, unless you can get a license from the mayor, you cannot act under this grant. It is absurd to call this an interference with the mayor's official functions. There is not to be found in this resolution a single quality or capacity of the company which is not legally admissible in, and practically well enough adapted to, a voluntary trading association; nor one which is peculiar to, or characteristic of, a corporate body. The special provision for the control of a majority is common in partnership agreements, and perfectly valid. (*See Perkins' Collyer on Partnership*, §§ 197, 198, 223, *and cased cited in notes.*) A provision making the interest of a partner transferable to his representatives on death, or to his assignees, and requiring the business to be continued for their benefit, is not uncommon, and is perfectly valid. (*Perkins' Collyer*, §§ 9, 119, 223. 3 *Kent*, 56, 57, *and notes. Chapel* v. *Cadell, Jacob*, 537.) A clause of expulsion in case of delinquency, is also common. (*Perkins' Collyer*, § 233.)

These are the only provisions which have been objected to. They are not subject to just criticism; and if they were, it is manifest that their invalidity would have no effect to impair the

grant. *Utile per inutile non vitiatur.* " But whether this is so or not," says Judge Harris, in 17 *Barb.* 443, " these provisions cannot vitiate the grant itself."

In discussing the legal character and practical operation of city rail roads, we have shown that their establishment does not create an exclusive use of the street, and have thus answered the objection on that score.

Ill faith is imputed to the common council in not making the grant to Lynch and his two associates, on their offer to pay $40 per annum for each car used, and to charge no more than three cents to each passenger. This, it is said, would bring a large revenue into the city treasury, besides furnishing to the citizens cheaper accommodations. We deny that any thing of the kind would have resulted from a grant to Messrs. Lynch & Co. The common council had no moral right to establish this rail road, unless it was calculated to be "good, useful and convenient for the inhabitants and travelers" on Manhattan Island. (*Charter,* §§ 14, 16.) Having arrived at an affirmative conclusion on that point, it became their duty to facilitate and *secure* the construction of the road. As all alterations of the existing state of things are opposed by some whose peculiar interests, passions or prejudices are interfered with, so this design met with violent opposition. (*See the strong remarks of the court in Dudley* v. *Cilley,* 5 *N. Hamp. R.* 562 ; 7 *Mass. R.* 166 ; 16 *Pick.* 220.) No evidence was given of the ability of Lynch & Co. to carry through the enterprise, except some *hearsay* evidence that they might be worth, in the aggregate, about one-tenth of the sum required for the purpose. Upon this state of the proofs, it is said that the defendants have not shown ill faith, or inability on the part of Lynch & Co., or that they were opponents of the measure. If this were true, we object to the attempt to shift the *onus probandi.* The common council have, in the due exercise of their legislative power, adjudged it to be an offer "*not fit*" to be accepted. On that we may repose. (*Att'y Gen.* v. *Cohoes Co.* 6 *Paige,* 134. *Lord Cottenham, in Frewin* v. *Lewis,* 4 *Myl. & Cr.* 255.)

Having disposed of this lengthy budget of exceptions, it only

remains to draw the attention of the court to the act of April 4, 1854. Immediately after the grant in question, the plaintiffs brought this suit, and obtained a preliminary injunction, restraining the defendants from constructing that part of the road which is located on Greenwich and Washington streets. Although not actually deprived of power to construct the part located on the Ninth avenue, the unfavorable season, and considerations connected with the existence of the injunction, induced the company to defer commencing the work until spring. They commenced the road on the first of April, 1854, and progressed steadily onward in its construction until they reached the territory covered by the injunction. About one half of the road has been built. On the 4th of April, 1854, the legislature enacted that " the common councils of the several cities of this state shall not hereafter permit" rail roads to be constructed in the streets or avenues, without the consent of a majority in interest of the adjacent lot owners. (*Laws of* 1854, *p.* 323.) The 3d section reads as follows : " This act shall not be construed to prevent the construction, extension, or use of any rail road, in any of the cities of this state which has already been constructed *in part ;* but the respective parties and companies, by whom such roads have been *in part* constructed, and their assigns, *are hereby authorized* to construct, complete, extend and use such roads, in and through the streets and avenues designated in the respective *grants, licenses,* resolutions or contracts, under which the same have been so *in part* constructed ; and to that end the grants, licenses and resolutions aforesaid *are hereby confirmed.*" A substantial portion of the road in question had been constructed when this act became a law. It would seem, therefore, that whatever might otherwise be the legal conclusion in this case, this confirmatory act has removed all difficulty, and given to the grant in question an impregnable legal basis.

Soon after our general statute, authorizing rail road companies to incorporate themselves by voluntary act, the legislature of Illinois adopted a statute, entitled, " An act to provide for a general system of rail road incorporations." The provisions of the act were modelled upon those of the New York law ; but

there were many deviations from the model. These gave rise to an opinion which prevailed extensively and led to much litigation, that a special act was requisite to the creation of each corporate body. *After judgment* in an inferior court upon a quo warranto filed against a company which had assumed corporate powers under the general law, the legislature passed an act authorizing it to construct its road, declaring it to be a valid and subsisting corporation under its articles of association, and that its acts and proceedings "*hitherto*" were valid and binding. On writ of error, the supreme court of Indiana, per Treat, C. J. held as follows : " It is not necessary to determine whether the defendant had authority to construct the road in question by virtue of" the general statute. "Even if it possessed no such authority under that law, ample power has been given it by subsequent legislation. Referring to the confirmatory act he says : "This act removes all the difficulty in the case. If the company had not the right originally to construct the road, the legislature has expressly conferred it. If there were defects in its organization, they are clearly cured by this act. If the company had forfeited its franchises, the state has waived the forfeiture. This court has now no power to declare a forfeiture for any cause existing prior to the passage of this act, as the state alone may insist upon or waive a forfeiture." He concludes, as we trust your honor will conclude : " It is manifestly the duty of this court, to leave the company to prosecute the enterprise to its completion." (*People of Illinois* v. *The Miss. and Atlantic R. R. Co.* 14 *Illinois R.* 446.)

A new set of objections start up at this stage of the case ; but they are easily disposed of. Here is the assent of the supreme legislative power. This has been held in all the cases sufficient to justify a rail road in a city street, even where the fee of the street was in private individuals ; and that, too, without providing for compensation to the fee holder. The act refers to "*common councils*," and thus shows an intent to ratify *their* "resolutions" establishing rail roads, thus disposing of all objections founded on the supposed necessity of action by the executive department.

In their printed points, the plaintiffs say, that the exception in the third section was not intended to avoid the effect on these cases of the seventh section of the charter of 1853, requiring property or franchises to be sold at public auction to the highest bidder ; and could neither have been intended to "waive or legalize any such frauds" as these corporation grants of rail roads for prices below what could have been obtained under offers actually made. It was perfectly notorious, for years before the passage of this act, that these rail road grants were all made by corporate resolution, and not by public sale to the highest bidder. They were all publicly impeached in our courts, on that account. It was equally notorious that in every instance the opponents of the road got up a counter-proposition tendering terms, apparently more advantageous : for rejecting these, as an alleged breach of trust, the common council was in each case impeached in the courts, and to some extent successfully. These things must have been known to the legislature ; such is the presumption of law. (1 *Caines,* 180.) It was to put an end to these vexatious contests that this peace act was passed by the legislature, affirming all that had been done, and regulating the future. The plaintiffs' own printed points contain an admission of this. They say, the exception in the third section was obviously intended to relieve certain rail roads, (such as the 2d, 3d, 6th and 8th avenue rail roads,) then in existence, against the prohibition of the two first sections." That very Second avenue rail road had been stayed by an injunction on *all the same grounds* of objection which were made in the Broadway case, and are now made in the present. (*Stuyvesant* v. *Pearsall,* 15 *Barb.* 244.) So the pretended breach of trust and illegality were both intended to be waived *in that case,* by the plaintiffs' own admission ; must not the same words have the same effect in this case ?

It is said that this act is void, because it violates *Art.* 3, § 16 of the constitution, which provides that " no private or local bill which may be passed by the legislature, shall embrace more than one subject, and that shall be expressed in its title." This is not a private act certainly ; neither can it be called local ; for

Wetmore *v.* Story.

it embraces all the cities in the state. A law regulating or applying equally to all places or persons of a large specified class, is not local or private. An act regulating auctioneers is a public act; an act regulating all towns, or all villages, or all cities, or all creeks, lakes, rivers, streams, farms, or roads, cannot be deemed in any sense *local.* Besides, this provision of the constitution is incapable of being enforced by the courts, and must be regarded as merely advisory to the legislature. It exists in many state constitutions, and is very little attended to. It is emphatically a law of imperfect obligation.

The assertion that this act creates a corporation by special act, and therefore violates *Art.* 8, § 1 of the constitution, is unfounded. It neither creates, nor professes to create, a corporation. And if it did, the prohibition against creating corporations by special act contains two exceptions, either of which would embrace the present case. *First.* It is "for municipal purporses;" and *secondly,* the legislature is authorized to proceed by special act whenever, "*in the judgment of the legislature,* the objects of the corporation cannot be attained under general laws." In the original draft of this section, as presented to the constitutional convention of 1846, the question of practicability to effect the object by general laws, was left open. This would have enabled the courts to annul an act of incorporation after extensive interests and complicated business relations had come into being under it. The mischievous effects which might result from the existence of such a power were perceived, and the special committee of five, to whom the whole subject and all propositions connected with it were referred, reported the section in its present form. Hon. A. L. Jordan, since attorney general of the state, was a member of the committee, and the words "*in the judgment of the legislature,*" were inserted on his motion. (*Convention Jour. pp.* 1211, 1213, 1227.) It is a most judicious provision. We have only to say, in conclusion, that what the constitution has expressly confided to the judgment of the legislature, the courts cannot rejudge.

This brings us to the last of these objections. It is a bold one ; but it can readily be disposed of. It is said that the grant

VOL. XXII. 61

to the defendants was absolutely void when made, and that a
*void* thing cannot be set up by a *confirmation.* (*Co. Litt.* 301,
*Shep. Touch.* 311, *div.* 3.) This is a common law rule of con-
veyancing, applicable to the deed of a private person ; and even,
as such, having a very narrow sphere of practical operation, if
indeed, in strictness, it has any at all. The word " confirm" is
sufficient in a grant, so the deed which cannot enure as a *con-
firmation,* will take effect as a *grant.* But this rule of convey-
ancers' practice, existing at the common law, imposes no
restraints upon the legislature. Like every other rule of prac-
tice, it may be changed by the law-making power. " It is com-
petent," says the court, in 6 *Hill,* 48, " for the legislature to
create an exception both to the common law rule (of conveyanc-
ing) and the statute of frauds."

The plaintiffs contend that this rule is binding upon the leg-
islature, because they find it applied in England to *crown* grants.
There is no analogy. The crown of Great Britain can neither
make, nor dispense with the law. The legislative power is in
the king, with the lords and commons in parliament. (2 *Selden,*
539.) The plaintiffs need not to have gone as far as *Coke upon
Littleton* for an authority on this point. *Jackson* v. *Adams,*
(7 *Wend.* 367,) is directly in their favor ; but the error of that
decision is very palpable. See precisely the opposite doctrine
ruled, and its foundation distinctly stated by the supreme court
of the United States, in *Fairfax's Devisee* v. *Hunter's Lessee,*
(7 *Cranch,* 622, 631.) The case cited from 14 *Illinois R.* 446,
is against the plaintiffs on this point.

S. B. Strong, J. The plaintiffs are owners in fee of lots
and buildings—Wetmore and Hoppock severally on Washington
street, and the Stuarts on Greenwich street—all south of and
below Reade street. They respectively claim to the center of
the street opposite to their lots. They are tax payers to a
considerable extent in the city of New York. They complain
that the defendants threaten and intend to construct a railway
through the two streets, their entire length, and extending
through the Ninth avenue to Fifty-first street, under an alleged

grant from the common council of the city, by resolutions pur-
porting to have been adopted by the board of assistants on the
20th of December, 1852, and by the board of aldermen on the
5th of January, 1853, and subsequently on reconsideration,
after the mayor's veto, in November and December of the
latter year.  The plaintiffs aver that the grant is invalid, and
that they have a right to prevent its operation, as tax payers,
as proprietors of lands which it is proposed to devote to a new
purpose without allowing them any compensation, and as per-
sons who will sustain a special injury by the construction and
proposed use of the railway ; and therefore ask for an injunc-
tion restraining the defendants " from entering into, or upon,
Greenwich and Washington streets, for the purpose of laying
or establishing a rail road therein, and from digging up or sub-
verting the soil, or doing any other act, in these streets, tending
to incumber them, or to prevent the free and common use
thereof, as the same have been heretofore enjoyed." The de-
fendants in their answer deny that the plaintiffs are the owners
of the soil of the streets mentioned in their complaint, or any
part thereof ; but they allege that the ownership is wholly vested
in the corporation of the city.  They aver that the corporation
had power to make the grant in question, and that it was cor-
rectly made ; and they state in a supplemental answer that
" they actually commenced the construction of the proposed
rail road, prior to the 4th of April, 1854, and that before that
day the said road was in part actually constructed in conformity
to the resolutions of the common council," and that on that day
the legislature of the state passed an act ratifying, confirm-
ing and establishing the grant to them ; and they admit that
they were constructing, and claim that they have the right to
complete, and use, the proposed rail road.  The judge before
whom this action was tried at the special term, decided that the
construction of the proposed road along the streets where they
passed the plaintiffs' lots, would inflict serious private injury upon
the plaintiffs, in unduly obstructing them in approaching to their
respective places of business adjoining upon such streets, amount-
ing in effect to a private nuisance to them, unless the grant is

valid; but he also held that the grant was legal and valid, and that the defendants should not be restrained from proceeding with the construction of the road; and he therefore dissolved a preliminary injunction which had been granted, and gave judgment for the defendants.. An appeal from his decision has been brought by the plaintiffs, and is now before us for our determination.

It is entirely clear that suits for the redress or prevention of public wrongs, where there is no pretense of injury to individuals in their private capacity, can be maintained only by, or in the name of, the people. Where, therefore, individuals, without invoking the aid of the public, call upon our courts for protection, they must show that their private rights are endangered. The principle is too clear to need any illustration, and too well supported to require the citation of any authority. In speaking of public wrongs, I do not intend to include such as may be sustained by corporators by the mismanagement of their corporate funds or property, by their officers. These are included in the class of private wrongs. Their officers act in the capacity of trustees, and their conduct as such is subject to the rules applicable to individuals. It is not a matter in which the people of the entire state in their collective capacity have any interest. If the proposed grant to the defendants in this case is of a franchise in the streets, that would unquestionably be property belonging originally to the corporation; and if the grant is improvident, and involves a breach of trust, it would for that reason be invalid, as much so as if it had emanated from individuals in their private capacity. Then, too, the plaintiffs as corporators, and therefore the beneficiaries, would have the right in behalf of themselves and their associates, to impeach the transaction. In the case of The Mayor, Aldermen and Commonalty of the city of New York v. Britton, (pamphlet report,) Chief Justice Nelson says that in the case of *Bailey* v. *Mayor &c. of New York,* (3 *Hill,* 531,) it was held that "the grant of the legislature authorizing the city to furnish the inhabitants with pure and wholesome water, by means of the Croton aqueduct, was the grant of a special private franchise, made as well for the private emolument and advantage of the

city as for the public good, and that the defendants, *quoad hoc,* were to be regarded as a private company, and to be dealt with accordingly; that they stood upon the same footing, in this respect, as would any person or body of persons upon whom the like special franchise had been conferred." I retain the opinion which I expressed in the case of *Milhau* v. *Sharp,* (15 *Barb.* 230,) that these grants of permission to construct, and in a limited manner use, railways in the city, are in terms grants of franchises. The resolutions in this case purport to convey to the grantees, and, as I conceive, to them exclusively, the right to run cars upon the rails, for the conveyance of passengers, subject to the provisions therein specified; and they provide that the joint stock association which may be formed, " shall have the control, management and direction of the road, and the business thereof." It was insisted on the argument that the resolutions in question cannot operate as the grant of a franchise, because they are not under seal. But when a grant is by an act of legislation, and not by individuals, pursuant to it, a seal is unnecessary. There is no limitation of the time for which the grant is to endure, nor is there any express power of revocation. If such a power can be implied from the character of the trust devolved upon the corporation by its charter, that would not deprive what is granted of its character as a franchise, while it continued. I do not intend to say that it is competent for the corporation to grant to individuals a franchise in the use of the public streets; I only speak of these resolutions as they read. If the grant would have been valid according to its plain import, provided it had been made in good faith, it seems to me that the plaintiffs can assail it for unfaithfulness in the administration of a trust, not in their character of tax payers, for that would include non-resident owners of real estate, but as beneficiaries or *cestuis que trust.* But it is a serious difficulty in their way in this particular, (and one which relieves me from considering the question of good faith in the common council,) that the judge who heard the evidence on this subject has decided that no breach of trust was proved. So grave a charge ought not to be lightly inferred, but to be of any avail

should be affirmatively and clearly sustained by the evidence. The charge was, that more advantageous offers were rejected by the common council, but the judge says that a better *bonâ fide* offer is not proved to have been made. In an equity case we are not, it is true, concluded by the verdict of a jury or the decision of a judge on questions of fact; but upon a full examination of the evidence, I am satisfied that the judge came to a correct conclusion upon this question. The plaintiffs cannot, therefore, avail themselves of this alleged ground to sustain their action.

The allegation of the plaintiffs, that the defendants propose to take their respective lands for the track of the road, is not sustained by the proof. Their titles to the lots claimed by them were not admitted in the answer, nor were the conveyances to them produced in evidence on the trial. There was proof of possession of the lots and buildings adjoining the streets by the plaintiffs, or under them, as owners; but there was no direct evidence of their possession of any part of the streets in front of their lots, except of the vaults, for which they had respectively made compensation to the common council, to which body they had applied for permission to construct them. In the country the possession of land. adjoining a public highway is justly deemed some, although not conclusive, evidence of the possession of the adjoining half of the road, subject to the easement. Ordinarily the owners of the land devoted to public use, in the rural districts, retain some right in the soil— all the private rights which may be compatible with the free and unobstructed exercise of the public privilege. Thus they have the exclusive right to the pasture and the wood, which are frequently of considerable value. The existence and the common exercise of the right raise a presumption in favor of the adjoining proprietors. It is but a presumption of fact, however, and may be rebutted. In cities, the pristine or (if there be any such) the existing owners of the strata of the streets cannot exercise any acts of possession, for their individual benefit, over the devoted soil. The many uses to which it may be appropriated preclude that. They have not, therefore, any pos-

session which can raise a presumption of title. Especially is this true in a city, where the title to the land, in a great portion of the streets, is vested under the provisions of law in the corporation. If, however, there was any presumption of title in the plaintiffs, by reason of their possessing the lands adjoining the streets, that would be fully met by their admission of title in the corporation, implied by their application for permission to construct vaults under the half of the streets adjoining their lands, and paying a compensation for the privilege. I do not deny but that if the plaintiffs had proved that the title to their lots had emanated from those who at the time had owned the beds of the streets, and their deeds had bounded the property by the streets in general terms, their title would have extended to the center. The vendor could have had no inducement to retain any title to the portions of the streets fronting the lots and buildings of other proprietors; and besides, as a street boundary may be the margin or the center, the construction most favorable for the grantee might be applied, which would carry him to the more capacious boundary. That is the rule where the conveyance is between private individuals, acting in reference to their own property. It is different when the state is a grantor; and I am inclined to think that it is inapplicable where the grantor is a corporation, holding the lots for private and the streets for public purposes. There the boundary of the private property by that held for public purposes would apply to the dividing line between the two, the same as when one lot is bounded by another. If a vendor has no title beyond the adjoining margin of a highway, and bounds the grantee by the highway, in general terms, with a covenant of seisin, it would be no breach of the covenant that his title did not extend to the center of the highway. If, therefore, the plaintiffs had traced their titles back to their corporation, and the corporation had, in the original conveyances, bounded the lots by the streets, I think that they would not have thereby established their claims to any part of the adjoining streets. If, however, the plaintiffs had clearly proved that their titles extended to the center, the value of their interest would have been merely

nominal.   The public would still have a right to engross the use, to the exclusion of the enjoyment of any private right, so long as the public easement should continue ; and as there is no probability of a discontinuance, the right of reverter would be worthless.   It is for this reason that when the corporation demand, and acquire by legal proceedings, the absolute title to the lands dedicated by the owners to the public for streets, a nominal compensation only is awarded.   (*In the matter of Thirty-second street,* 19 *Wend.* 198.   *In the matters of Twenty-ninth and Thirty-ninth streets,* 1 *Hill,* 189, 191.)   If, then, the prosecution of the proposed measure had been for a purpose to which the lands claimed by the plaintiffs had not been previously devoted, they would not have been entitled to an injunction to protect an interest of merely nominal value ; more especially as they could have obtained ample redress after the actual infliction of the injury.   But the use of the street for a railway would not vary its primary designation.   It was designated principally for a pass-way, and a railway furnishes an improved method of locomotion.   The late Judge Jones says truly, in *Drake* v. *The Hudson River R. R. Co.* (7 *Barb.* 508,) that " the said road, with its cars propelled by the application of steam, or by animal power, is a new mode of using the street, but still it is a use of it for passing and repassing through it with vehicles for the carriage of passengers, and of goods and freights; and the use of the streets by cars with passengers is equally within the acknowledged right thus to traverse the streets with carriages, as the use of them by other vehicles for similar purposes."   If, therefore, the plaintiffs had any title to the lands in the streets, their property will not be used for any purpose other than to pursue previously acquired privileges, and they are not entitled to any compensation, nor, of course, to an injunction, for the reason that no compensation has been awarded to them.   If the objections which I have been considering had been originally valid, they would not have been cured by the confirmatory act of April 4, 1854.   The legislature may, as some suppose, (although I do not,) possess despotic power, except where the people have been so fortunate

as to restrict it by their organic law; but that contains a restriction broad enough to prevent the enactment of an effectual law to sanction the breach of a private trust, or to prevent private property not only from being taken, but from being in effect annihilated, without a fair and just compensation to the owners. It is, however, unquestionably competent for the legislature to relieve a measure from any objections exclusively of a public character. That would of course be no infringement of private rights; and the rights of the people in their collective capacity are generally subject to legislative control. If, therefore, the resolutions in question exceeded the power conferred upon the city legislature, in authorizing the construction of the proposed railway at all, or in creating or conferring upon private individuals a franchise which would constitute a monopoly in the public streets, and which would in effect violate a general provision in the law of the state for the benefit and protection of travelers, or in restricting the common council in their power to regulate the streets, or in authorizing the creation of a public nuisance, irrespective of its effects upon the rights of private individuals; or if the common council, in making the grant, assumed executive or administrative powers which had been expressly denied to them; or if the resolutions would interfere with the power conferred upon the mayor, to license carriages; all these being, as was truly said by the counsel for the defendants, "objections with which no private individual has any concern, and of which the state alone can complain," were effectually released by the confirmatory statute, and which, so far as it relates to these matters, the same learned counsel very properly denominated "a peace act."

The remaining objection is, as I view it, of a much more formidable character. It is that these alleged resolutions were never adopted by the common council—that they were never legally passed. That the two boards, in what they passed in this matter, acted in their legislative capacity, I do not entertain a doubt. Whether it is considered as a simple regulation of the streets, revocable at any time, or as a grant of

franchise, it is still a legislative act. The delegation of legislative power to the common council is in general terms. It is limited, of course, by the constitution and laws of the state, but neither restricts it in the particular which I am considering. As the statute gives no definition of the term, it must be understood and interpreted according to its ordinary significa- tion. The practice of the constituting power may always be considered, and should have controling weight in the interpre- tation of its own language. Now it has ever been the prac- tice of our legislature to confer franchises, and even to convey lands to individuals, by legislative acts. If a principle like this needs confirmation, it has it in the case of *Fletcher* v. *Peck*, (6 *Cranch*, 137,) which was cited by the defendants' counsel. I do not think that it was decided otherwise by our court of appeals in the case of the *People* v. *Sturtevant.* It is difficult to say how far the court intended to go in that case. The only point necessarily decided was, that if those proceedings of the common council purporting to authorize the construction and use of railways were legislative acts, they were not so far exempt from judicial interference that an injunction restraining legislative action was void, or could be safely disregarded. That was enough for the determination of that case, and what- ever else was said in the opinion of the learned judge was an *obiter dictum*, and no doubt would be so considered by him in any subsequent case. The common council, in the years 1852 and 1853, consisted of a board of aldermen and a board of assist- ants, who together possessed and wielded the legislative power of the corporation. There could be no act of the common council without the co-operation of both boards. The term board, as applied to those bodies, may have two meanings— one abstract, having reference to the legislative creation, which is continuous; and the other referring to its members, in which latter and more important sense it is changed by every new general election. The members, of course, constitute the board for all purposes of action; and when powers are to be exercised, the members legally assembled can alone act. Legis- lation, to be effectual, must be performed by the two boards,

who together constitute the common council. Now, as an acting body, the common council of 1852 was not the common council of 1853, because there was an entire change of the members of one of the constituted bodies—the assistants—on the 1st of January, 1853. The resolutions in question were not passed by the common council of 1852, as they were not then adopted by the board of aldermen, nor by the common council of 1853, as they were not then adopted by the assistants. It is not pretended that the resolutions were passed in 1852. They were not passed in 1853, because the assistants of 1852 and the aldermen in 1853 could not, in the latter year, coalesce so as to form one common council. The members of the two boards are the legislative representatives of the corporators, and their acts in that capacity are considered as the acts of the corporation. They derive their efficacy from the principle of representation. They are representatives only during their official term. Who, then, were the legal representatives in 1853? Most assuredly the then existing aldermen and assistants, and no act could be passed in that year without their co-operation. But if the procedure in this instance was valid, an act might be passed, not only without the co-operation of the two existing boards, but in opposition to the views of the members of one board, by whom it had never been approved, or even considered. The legislature might have authorized this anomalous procedure; but it has not done so, certainly not in direct terms, nor, as it seems to me, by inference. The provision in the amended charter of 1849, "that when the mayor is prevented from returning an ordinance or resolution of the common council by the close of its session, it shall not be a law until the expiration of five days after the commencement of the next session of the common council, by whom the ordinance or resolution shall be reconsidered, if returned within such time, and be disposed of in the same manner and with the like effect as if presented at the preceding session," has reference to the same council by whom the ordinance or resolution was originally passed, and not to one whose members had been changed. That construction is supported

by the direction that the ordinance or resolution shall be reconsidered at the latter session. Reconsidered by whom? Certainly not by those who had never considered it before. But if the provision may apply to a newly elected board, it is special, relating simply to a reconsideration of a measure by the two existing boards, and can be extended no farther—certainly not so far as to violate a principle of representation. The case of *Coles* v. *The Trustees of Williamsburgh*, (10 *Wend*. 659,) simply decides that where a petition is necessary to any act of a municipal corporation, one presented to a former board will authorize their successors to proceed. That may very well be, as the presentation of the petition was a perfected act, so far as it related to the subscribers. Nothing more was to be done by them, and as to them it mattered not to which board it was presented. That has no reference to the case where the conjoint action of two constituent bodies is requisite to make it the action of the composite body. The delegation of legislative powers to the common council, as it was constituted in 1852 and 1853, was by statute. The Dongan charter, it is true, recites that "the city of New York is an ancient city, and the citizens of the said city have been anciently a body politic and corporate." That was not enough, however, to show that it was a corporation by prescription; nor could it have been such, as sufficient time to make it such, under the English law, had not elapsed since the discovery of the continent. If, however, it had been a corporation by prescription, the division of the common council into two boards was by statute and of modern date. The principles which control this new institution are such as are applicable to recent enactments. In such cases the grant to the corporation cannot be explained, and most assuredly its powers cannot be created, by usage. In ancient grants, and especially when expressed in obsolete phraseology, usage under them may be resorted to for explanation, but never, even in such cases, to establish additional powers. That the common council may have adopted a practice conformable to what was done in this instance, and pursued it for a period of twenty-five years, if

it had been fully proved, which it has not, would not have shown that it was legal, or within the compass of their powers. Their legislative powers were not derived from usage, but were acquired wholly under the statute. In all such cases, if there are express statutory definitions, they must control; but if there are not, any power conferred must be taken with its ordinary qualities and incidents. That is the reasonable rule, and it has been established by authority. What then was the rule, in the particular which I am considering, in legislative bodies consisting of two branches? In England, when there was an election of a new house of commons, the unfinished business pending in the preceding parliament was at an end. There was never an instance where a bill adopted by the house of commons, only, of one parliament, was taken up by the house of lords and finally passed without the concurrence of the newly elected body. The rule has been extended to prorogations, and where the same houses re-assembled. Blackstone says, (*Com. vol.* 1, *p.* 186,) that "prorogation puts an end to the session, and then such bills as are only begun, and not perfected, must be resumed *de novo* (if at all) in a subsequent session." Jefferson says, (*Manual*, § 61,) "Parliaments have three modes of separation, to wit: by adjournment, by prorogation or dissolution by the king, or by the efflux of the term for which they were elected. Prorogation or dissolution constitutes there what is called a session, provided some act has passed. In this case, all matters depending before them are discontinued, and at their next meeting are to be taken up *de novo*, if taken up at all. An adjournment, which is by themselves, is no more than a continuance of the session from one day to another, or for a fortnight, a month, &c. *ad libitum*. All matters depending remain in *statu quo*, and when they meet again, be the term ever so distant, are resumed, without any fresh commencement, at the point at which they were left." (1 *Lev.* 165, *Lex. Parl.* c. 2. 1 *Rolle's Rep.* 29. 4 *Inst.* 7, 27, 28. *Hutt.* 61. 1 *Mod.* 152. *Jac. L. Dic. tit. Parliament.*) He subsequently remarked, that "when it was said above, that all matters depending before parliament were discontinued by the determination

of the session, it was not meant for judiciary cases depending before the house of lords, such as impeachments, appeals and writs of error. These stand continued, of course, to the next session. (*Raym.* 120, *Jac. L. D. tit. Parliament.*) Impeachments stand, in like manner, continued before the senate of the United States." It is stated in a note, " that it was held in the case of Hastings, that a dissolution did not work the discontinuance of an impeachment." Impeachments are like indictments, and when once preferred, they remain pending before the courts until they are decided ; so, too, the house of lords acts as a court in hearing and deciding appeals and writs of error, and is then governed by the same rule of procedure. But the action of the house of lords, when sitting as a court and acting alone, furnishes no rule for governing their conduct when acting in their legislative capacity, where the concurrence of another body is requisite. Bacon, in his abridgement, (*title Court of Parliament, F.*) says, " the diversity between a prorogation and an adjournment or continuance of the parliament is, that by the prorogation in open court there is a session, and then such bills as passed in either house, or by both houses, and had no royal assent to them, must, at the next assembly, begin again ;" " but if it be only adjourned or continued, all things continue in the same state they were in before the adjournment or continuance." The practice of the English parliament, when acting legislatively, has been uniformly followed by the congress of the United States, by the legislature of this state, and, so far as I know, by the legislatures of all the other states. In all these bodies, when there has been a new election of either branch, the unfinished business of their predecessors is considered as absolutely discontinued, and if taken up at all, is acted upon without reference to what has been done before. Why is not this rule applicable to the common council of New York ? Can a power delegated to them be taken without the restrictive incidents which enter into its definition ? And above all, can it be supposed that when a superior body confers some of its own power upon an inferior one, it designs to go beyond its own limits ? I am satisfied that this rule of action in all legis-

lative bodies must govern and control the common council of New York in their legislative proceedings. The supposed resolutions in question were therefore null and void when presented to the mayor for his consideration. The subsequent action of the two branches was not, therefore, upon the reconsideration of a previously adopted ordinance. If it could have any effect it would have been as an original or a new enactment. In that view it was ineffectual, as it was not subsequently presented to or approved by the mayor. In fine, what was attempted to be done was neither a grant, license, resolution or contract of the common council, or, in fact, of anybody. It was not, therefore, confirmed by the "peace act" of April 4, 1854. It was not embraced in its terms, nor could it have been the design of the legislature to complete the unfinished business of the common council, or of either of its branches. The resolutions in question had been adopted but by a single board in any year, or during the existence of any one common council, and were not, therefore, at any time the act of the entire body. If such resolutions are characterized by what they are, and not by what they are designed to be, a confirmation of the acts of the common council would not reach them. In this point of view it is unnecessary to consider the question discussed at the bar—whether a nullity from inherent defects can be confirmed by an act of the legislature? Or, another question, whether the legislature, having devolved the power of regulating the streets upon the common council, can resume it without the consent of the inferior body, legally expressed?

Connected with the objection which I have last considered, are the questions whether, by the construction or use of the proposed rail road, the plaintiffs would clearly sustain a serious special injury which would produce a public nuisance; and if so, one peculiar to themselves, by the noxious procedure. I agree to what appears to be the predominant judicial sentiment in this state, that an authorized rail road in a city is not a public nuisance. When the principal act is sanctioned, that legalizes the temporary obstruction to the public caused by the prosecution of the appropriate work, and would prevent any

effectual action by individuals on account of any consequential injury—although it might be peculiar to them—which should necessarily result from it.   But it is otherwise when the rail road is constructed without the requisite authority ; then the obstructions, at least in removing the pavement and laying the rails, would be unjustifiable, and as they would necessarily be considerable, they would amount to a public nuisance.   If the injury would be confined to travelers, (and by that term I intend to include all who use the street simply as a passway,) the people alone could sustain an action for its reformation or prevention.   In order to enable individuals to maintain a suit for prevention in their own behalf, it must be apparent that the injury of which they complain will ensue, and will be peculiar to themselves.   The apprehended deleterious result must be reasonably certain, and not merely possible or even probable. Thus if one threatens to dig a pit, or deposit a log in the high-way, an individual cannot obtain an injunction to prevent the nuisance because he is in the habit of riding in that part of the highway in the night, and he or his horse will probably sustain a fall ; not even if it should be near his dwelling house.   The dan-ger might be imminent under such circumstances, but not certain, and it would also be one which he would share with the travel-ing public, and would extend no further than to what might be incurred in the use of the street simply as a passage, and the greater probability or extent of the apprehended injury by reason of propinquity would not change its character from public to private.   The judge who tried this action found sub-stantially that the plaintiffs would sustain special injury by the obstruction, to the access to their stores.   This apprehended grievance is not one of those particularly specified in the com-plaint.   It is included in the general charge that the proposed work would, if prosecuted, be specially injurious to them.   The rules of good pleading would seem to require greater partic-ularity ; but if the complaint was defective in that particular, the defendants should have moved for an order upon the plain-tiffs to reform it, or at any rate should have objected on the trial to the introduction of evidence to support a charge not

sufficiently specified. As they did neither, it is too late for them to raise it now. It must be considered as having been waived, especially as it was not even mentioned in the argument of the defendants' counsel, who never omits raising an available, or even plausible, point in behalf of his client. The judge's conclusion that the access to the plaintiffs' buildings on the nearer side of the streets through which it is proposed to construct the rail road, seems to be warranted by the evidence, and indeed was not seriously controverted on the argument. But the defendants' counsel contended so strenuously and ingeniously that this apprehended injury would not be special and peculiar to the plaintiffs, that it produced considerable doubt in my mind whether I had not been mistaken in the opinion which I had expressed to the contrary, in the Broadway rail road case. (*Milhau* v. *Sharp*, 15 *Barb.* 230.) I there say, " if the grant is void from the want of adequate power to make it, or indeed invalid from any cause, the plaintiffs as proprietors of buildings on Broadway, would be peculiarly and seriously injured by an attempt on the part of the defendants to construct the proposed railway, and they would be entitled to an injunction to prevent evils for which they could obtain no adequate redress in the law." My examination of the subject since the argument of this case has dissipated the doubts which were then created, and led me to a resumption of my former opinion. The injury in this case is not to the passage along or across the street from one part to another, which is a public privilege, but to the access from the street to the plaintiffs' buildings, which is a private right, in which the public does not share. An interruption to such access would inflict an injury upon the owner peculiar to himself, in which others have no concern. It is true that the number of sufferers in this instance would be very great; but that would not prevent any of them from obtaining individual redress. It might be a valid reason for including as plaintiffs in one action numerous persons who have no joint interest, for the purpose of averting a threatened evil from a common cause affecting them all. The injury, if inflicted, would be direct, and not remotely consequential. and the difference is very essential. Thus,

if a serious obstruction should be created in. the mouth of the Mississippi, it would to some extent impair the access from the ocean to the lands of the riparian owners on that noble river. But, then, the injury would be consequential to the interruption of a public privilege, and not directly acting upon a strictly private right. The public privilege of passing from the ocean into the river would be alone invaded, and that would not furnish a valid cause of action to individuals to whom the consequences might prove injurious. That distinction would prevent or render innocuous the "shower of subpœnas" in suits instituted by the successive riparian proprietors, to which allusion was made by the defendants' counsel. The decision of the court of appeals in the case of *Gould* v. *The Hudson River R. R. Co.* (2 *Seld.* 522,) does not overrule this doctrine. I say the decision because that applied to the questions actually involved, and was not necessarily accordant with all the remarks of the learned judge who expressed an opinion in that case. The question in that case was, whether an owner of land on the banks of the Hudson river could maintain an action against a rail road company for damages sustained by him, in being deprived, by an embankment, of his access to the river. The court held that the action could not be sustained, because the damages resulted from an obstruction authorized by the statute organizing the rail road. But if that is good law, it by no means follows that the action would have failed if the obstruction had been unauthorized by the legislature. The owner, it is true, would sustain a damage whether the *causa causans* was sanctioned by legislation or not, but if it resulted from a lawful cause it would be *damnum absque injuria*. I cannot suppose that the court of appeals intended to decide, nor do I believe it to be law, that the owner of land adjoining a highway, by land or water, has not a private right of access to it, (and if there is such a right it must necessarily be private, as the public cannot share in it,) or that damages caused by an interruption to it by an obstruction unlawfully interposed are irrevocable.

Upon the whole, I am satisfied that the project for the proposed railway was never legally adopted by the common council,

and that its pursuit, if tolerated, would inflict some serious injuries upon the plaintiffs, in which none but the proprietors of the land adjoining the streets through which it is designed to construct said railway would participate, and that, therefore, the injunction for which they ask should be granted.

The judgment at the special term should be reversed, and an injunction should be awarded pursuant to the prayer in the complaint.

I am not inclined to allow any costs.

ROOSEVELT, J. Messrs. Wetmore, Hoppock and Stuart, inhabitants of this city, and also owners of property on Greenwich and Washington streets, complain that the defendants, under the name of the Ninth Avenue Rail Road Company, and under color of a pretended grant from the city authorities, are about extending their rails through those streets, in front of the plaintiffs' premises, to their great injury and annoyance, and in violation of their rights. An injunction granted in the first instance, on their application to restrain the proceeding, was subsequently, at special term, dissolved and the complaint dismissed. From that judgment the plaintiffs have appealed, insisting that the injunction originally issued, instead of being dissolved, should be made perpetual.

On the part of the defendants, it is not pretended that *every* citizen has a right to lay a rail track in the streets of the city. The corporation, however, it is claimed, may do it; or, in their discretion, by a resolution of the common council, may grant the privilege, as a franchise, to a particular individual or association of individuals. Such a grant, it is alleged, has been made in this instance. The judge so held at special term. He placed his final decision on that ground. And the question therefore is, can a resolution, adopted by the board of assistants in one year, be concurred in by the board of aldermen in another year, so as to make it, without consulting the existing board of assistants, an ordinance of the common council? Or must it, as in the case of unfinished business in other legislative bodies, be taken up *de novo* ? When the charter of 1830

declared that "the legislative power of the corporation of the city of New York should be vested in a board of aldermen and a board of assistants, who together should form the common council of the city," it must be considered as having adopted by implication, so far as applicable, the universally recognized principles of *legislative* bodies, constituted of two independent branches. The settled practice and understanding—indeed, we may say the common law—of such bodies, as illustrated in the congress of the United States, the legislature of this state, and, it is believed, in the legislatures of every state in the union, as well as in the parliament of Great Britain, repudiates the idea that the board of aldermen of 1853 could take up and pass the resolution of the politically deceased board of assistants of 1852, and give it effect as law, without consulting the newly elected body, it might have been, although not so in the present instance, on the express ground of opposition to the particular act of their predecessors, and for the express purpose of preventing its consummation.

No case has been cited, in which the senate of a state, or of the United States, or the upper house of Great Britain and Ireland, has attempted to give effect to the inchoate action of a previous assembly, house of representatives or house of commons, whose term had expired and whose places were filled by others newly chosen in their stead. To allow an opposite practice in the legislation of the city common council since its new organization, would be at times to defeat the will of the constituents, clearly expressed through the regular channel of the ballot-box, and to render the elective franchise a nullity. Although the corporation of the city is a continuous body, the common council, since its division into two branches, is not. Its legal term, like that of the state legislature, upon whose model it was formed, is one year, and no longer. The common council of 1852 is not the common council of 1853. The resolution, therefore, set up by the defendants as their justification, although passed by *a* board of aldermen and by a board of assistants, was not a resolution of the *common council*, and as a consequence, was not confirmed by the state law of April 4th, 1854.

Wetmore v. Story.

The primary object of that act was to prevent the common councils of cities from permitting the construction of rail roads in the streets of cities, without the consent of a majority of the property owners immediately interested; and when it excepted, from its operation, rail roads already "constructed in part," it meant those constructed under lawful authority, and not under "grants, licenses, resolutions or contracts" which had never been made, given, passed or entered into according to the charter, and which, therefore, having in judgment of law no existence, could not be "confirmed." The confirmation intended was a confirmation as against the state, and not against the common council itself. An opposite construction of the act, instead of restraining the common council from permitting injurious rail roads, would go to sanction roads commenced in violation of law, and which had never been permitted at all. Having had, therefore, no warrant for its commencement, and none for its continuance, the road in question, under the evidence, is not only a public nuisance, but a public nuisance of which the plaintiffs have a legal right to complain as specially injurious to them in their ingress and egress to and from their places of business on the street. Such a nuisance, it is well established by numerous decisions, can and ought to be restrained by injunction, if demanded, as in this case, by the parties specially aggrieved.

The judgment therefore of the special term, we all agree, should be reversed, and a perpetual injunction awarded.

CLERKE, J. For the reasons above expressed in Judge ROOSEVELT's opinion, I concur in the conclusion at which both my associates arrived.

Judgment reversed.

[NEW YORK GENERAL TERM, September 8, 1856. *S. B. Strong, Roosevelt* and *Clerke,* Justices.]